THE STATE ex rel. CHARLES L. FLAUGH et al. v. BENJAMIN JAUDON, City Treasurer, and KANSAS CITY.

In Banc, December 31, 1921.

1. **TAXATION: Assessment: Valuations By State Board.** The final valuations fixed by the State Board of Equalization, whether completed before or after June 1st, govern the amount of state and county taxes. County officers and agencies must await the action of the State Board before they can fully complete their tax books or fix the assessed value of properties in the county.

2. ——: **Valuations in Kansas City: State Standard.** The Constitution in declaring that the valuation of property for city taxes shall not exceed the valuation for state and county taxes means the valuation of property in the city fixed for state and county taxes, for the year when all these taxes, state, county and city, are to be paid. The City Assessor need not fix his valuation as high as that for state and county taxes, but that does not change the fact that the valuation made by the state officers for state and county taxes must be his measuring standard of value, and the standard he must observe is the valuation for state and county taxes made for the year in which the taxes are to be paid.

3. ———: ———: **City Assessment: Completed Before State Valuation.** The charter of Kansas City requires the City Assessor on or before March 15th of each year, to make a return to the City Clerk of "a full and complete assessment of all property, real and personal, in said city on the first day of January next preceding," and authorizes the Board of Appeals to correct inequalities and errors in his assessments, and requires the City Clerk to present to the Common Council, at its first meeting for the fiscal year, which is made to begin on the third Monday in April, said assessment books so corrected; and all these things were done. *Held,* that the assessment made by the City Assessor and filed with the City Clerk was a valid assessment, if the valuations did not exceed the valuation made by the State Board of Equalization, although it was made in advance of the final valuation made by the State Board; and being valid and complete, the assessment books could not be re-opened and additional assessments made to conform the valuations to those made by the State Board.

4. ———: ———: ———: **Increase After Increase By State Board.** Under the Charter of Kansas City, the City Assessor, having completed his assessment of properties within the city and delivered his assessment books to the City Clerk, could not re-possess himself of them, and make increases in his valuations to conform to an increased valuation made by the State Board of Equalization thereafter made, but any subsequent assessment, to conform to such increase, is void; and the fact that the City Auditor had not made the extensions therein before the State Board acted, but did so thereafter, does not prevent the assessment from being complete, for the extensions and the delivery of the books by him to the City Treasurer are purely ministerial acts. When all the city agencies have acted and their acts are in conformity with the city charter and the State Constitution, the city assessment is closed, and cannot be opened on the theory that the State Board of Equalization, after such city assessment was complete, took final action by which the valuation of properties in the city, as made by the county officers for state and county taxes, was increased twenty per cent.

5. ———: **Tender of Amount Due: Mandamus: Several Relators.** Six taxpayers, who have tendered all the taxes due under an assessment admitted to be valid, although in different amounts, may be joined as relators in a mandamus suit, where the only issue sought to be litigated is whether an increase in the assessments made by the city officers in an attempt to conform the valuations to the increase made by the State Board of Equalization after the tax books were completed, was valid, and the only purpose of the suit is to compel the city treasurer to accept the taxes tendered as all that are due from relators.

6. ———: ———: ———: **Other Taxpayers Similarly Situated.** But the attempt to join as relators other taxpayers similarly situated, for whom the taxes legally due from them is not tendered, is not permissible in mandamus, and no writ as to them can go; but the allegations bringing them in may be regarded as surplusage, and the petition and alternative writ be good as to the taxpayers named who have made tender of all the taxes legally due from them, and the question whether an attempted assessment of further taxes against them was legal may be adjudicated, that being the only disputed question in the case.

## *Mandamus.*

WRIT ISSUED.

### *A. N. Gossett* and *W. W. Greene* for relators.

(1)    As the State Constitution provides that all property subject to taxation shall be taxed in proportion to its value; and as the Charter of Kansas City in its entire general-property taxation scheme and plan not only contemplates but expressly provides for a completely made, revised and returned assessment as the sole basis upon which the City Council can fix the rate for levy and collect such general property taxes, it necessarily follows that no city official can have authority to change the assessment as it was so completed before the council when the rate and levying ordinance is enacted, in this case on April 20, 1920. The power of a city to assess and levy taxes cannot be implied and when a complete scheme is expressed for the exercise of such power that method must be strictly observed and followed. All other is excluded. The city cannot levy such taxes until the assessment has been completely made and returned to the Common Council. Mo. Constitution, Art. 10, sec. 4; Warrensburg v. Miller, 77 Mo. 56; State ex rel. Harvey v. Cook, 82 Mo. 187; Howard v. Hicks, 88 Mo. 456; St. Louis & San Francisco Ry. v. Apperson, 97 Mo. 300; Hannibal v. Bowman, 98 Mo. App. 108. (2) The Constitution also provides that the valuation of

property in assessing it for purposes of city taxation shall not exceed the valuation (assessment) of the same property for State and county (taxation) purposes, but this is not a command that city assessments shall equal county assessments. It is a limit beyond which a city assessment cannot go, but below which it may fall; a maximum not a minimum limit; hence, a city assessment cannot exceed the last complete State and county assessment preceding the time when the city assessment under its charter must be completed. The city cannot hold its assessment in abeyance awaiting completion of an incomplete or future state and county assessment for its maximum limit, but cannot exceed the last fully completed state and county valuation. In this case such maximum is the assessment made as of June 1, 1918, acted on by the State Board of Equalization in 1919, and being fortuitously so completed the same in amount as the County Assessor's valuations as of June 1, 1919, before the State Equalization Board's action thereon of June 1, 1920, the very day the city taxes of 1920 became due after its assessment was bound legally to be and in fact was completed on or before March 15, 1920. Mo. Constitution, art. 10, sec. 11; City Charter, art. 5, sec. 6, et seq.; St. Joseph Lead Co. v. Simms, 108 Mo. 222. (3) Respondents attempt to justify the increases complained of by relators by claiming to have had the City Auditor hold land book until the order of the State Board of Equalization was made affecting the assessment for state and county purposes, and the city assessor then repossessing himself of said land book and marking the figures on same and drawing line through the valuations and amounts of taxes due as then fixed and shown by said book. There is no authority either in the City Charter, the ordinances or laws of this State authorizing it. Authority of Assessor to act must be found in the statutes: City of Carondelet to use v. Picot, 38 Mo. 125; State v. St. Louis County Court, 13 Mo. App. 53; City of Hannibal v. Bowman, 98 Mo. App. 108. Tax

assessment made by the assessor is the basis of the tax and if the assessment is void the tax is void. Hannibal ex rel. v. Bowman, 98 Mo. App. 103; State ex rel. Wyatt v. Wabash Ry. Co., 114 Mo. 11; State ex rel. v. Edwards, 136 Mo. 360; State ex rel. v. Thompson, 149 Mo. 441; Welty on Assessments, p. 36; Cooly on Taxation (2 Ed.), p. 42, note 35; Hamilton v. Ansden, 88 Ind. 304; Whitney v. Thomas, 23 N. Y. 281. (4) If the valuation is to be increased the taxpayer should be given notice. Art. 5, sec. 15, City Charter; State ex rel. v. Alt. 224 Mo. 507; Haga v. Reclamation Dist., 111 U. S. 710; County of Santa Clara v. Railway, 18 Fed. 409. (5) Mandamus is an entirely proper, efficient and allowable remedy, especially in case of such moment, as the one at bar. And, as in injunction cases, taxpayers similarly situated, all affected in the same manner and entitled to the same common relief, are entitled to join in such proceeding praying for the writ. State ex rel. v. Speer, 223 S. W. 655; State ex rel. v. Reynolds, 270 Mo. 599; State ex rel. v. Alt, 224 Mo. 493; American Mfg. Co. v. Ault, 184 S. W. 1167; State ex rel. v. St. Louis School Bd., 131 Mo. 505; State v. Tyler, 48 Conn. 145.

*E. M. Harber, M. A. Fyke* and *F. M. Hayward* for respondents.

(1) The writ of mandamus is an extraordinary writ —it is not analogous to a suit in equity. To entitle relator to the writ, he must have a clear legal right to the specific thing demanded; he must have made a specific demand for the specific thing demanded; he must be without other adequate remedy; he must not demand more than he is legally entitled to; he must show that it is the legal duty of respondent to comply with his demand. The writ in this case ought to be quashed because: 1st. The relators cannot jointly maintain the action. 2nd. The relators cannot invoke the writ in behalf of others similarly situated. 3rd. It is not averred that "others

similarly situated have offered to pay the tax confessedly legal.'' 4th. It is not shown that it was the duty of the City Treasurer, or that he had any power or authority to receive and receipt in full any amount other than the amount shown upon the tax books when delivered to him, and with which he stands charged. State ex rel. v. Fraker, 166 Mo. 130; 13 Ency. Pleading & Practice, 646; High on Extrordinary Remedies, 434-39, 26 Cyc. 395, note 14; People v. Morgan, 89 N. Y. S. 832; Heckart v. Roberts, 9 Md. 41; Hoxey v. County Commrs., 25 Me. 333; State ex rel. v. City of New Orleans, 52 La. Ann. 1639; Haskins v. Sups. of Scott Co., 51 Miss. 406. (2) How is the city assessor to arrive at a standard of valuation? He must of necessity look to the standard of valuation made by the State and county authorities, and keep within the constitutional limitations. This standard of valuation he cannot exceed. It is argued he may make his standard less. The State Board of Equalization is the body in which is vested the power to fix and determine the standard of value for taxation. Secs. 11348, 11384, 11371, 11392, 11402, 11403, 11411, 11412, and 11414, R. S. 1909. The provisions of our city charter must be in harmony with these statutes. City Charter, sec. 1, art. 5; sec. 3, art. 5; sec. 6, art. 5. From these it will be seen property for taxation for the fiscal year 1920, was to be valued at not what it may have been worth in 1918 or 1919, but at what it was worth when the assessment was made, for so far as personal property is concerned there might be large amounts held or owned in the city, January 1, 1920, which was not in existence or not in the city when the assessments were made for the years .1918 or 1919. (3) The City Assessor being required to assess property at its cash value, and being limited by the Constitution to not exceeding the value fixed for State and county taxation, could not unalterably fix a standard of value until the State Board of Equalization had fixed and established that standard, and when the State Board fixed the cash value that was the standard

for the City Assessor. If the State Board of Equalization had acted promptly, perhaps no difficulty would have arisen. St Louis & San Francisco Ry. Co. v. Gracy, 126 Mo. 485; State ex rel. v. Stamm, 165 Mo. 83; State ex rel. v. Phillips, 137 Mo. 259. (4) There is no provision in the charter that the assessment for city taxes shall be based on the valuation for any previous year. Hence the valuation for taxes for the fiscal year 1920 must be based upon the value as and when fixed by the State authorities for State and county purposes, for that year. Charter sec. 26, art. 18; Glasgow v. Rowse, 43 Mo. 487. Certainly the values for 1918 are not to be taken as a standard for 1920; assessments are required to be made each year. (5) If we concede that the assessment made by the County Assessor between June 1, 1919 and January 1, 1920 (R. S. 11384), and which he is required to make out and return on or before the 20th of January each year (Sec. 11392), is to be taken as a standard by the City Assessor, yet it will be seen that such an assessment is not final and complete until reviewed by the State Board, and when so reviewed and equalized this is the standard for both the county and city assessor. (6) It was the assessment made by the County Assessor between June 1, 1919 and January 1, 1920, that was increased by the State Board, and if it be true that the standard of 1919, as fixed by the State Board, is the standard which governs, then the City Assessor properly made his assessment thereon as fixed by the State Board. (7) The fact that the Board of Appeals of the city had met and adjourned is immaterial, because by Sec. 15, Art. 5, of the Charter: ''The board of appeals has no power or authority to change the rate or standard of valuation adopted by the assessor.'' The standard adopted by the City Assessor was the standard fixed by the State Board. Mayor v. Opel, 49 Mo. 190; North Mo. Ry. Co. v. Maguire, 49 Mo. 482.

GRAVES, J.—Original action in mandamus. Relators are some six taxpayers of Kansas City, Missouri,

who sue for themselves, and other taxpayers similarily situated. Respondents are Kansas City, and Benjamin Jaudon, the Treasurer of such city.

Upon application this court granted an alternative writ, to which return was duly made, raising some questions of facts. To this relators filed their reply, and the parties thereupon filed an agreed statement of facts, as follows:

"Agreed Statement of Facts.

"It is hereby stipulated and agreed as to the facts and acts set forth and mentioned in the petition or application and alternative writ herein as follows, viz:

"(1) The City Assessor did go through the form of making the City Assessment and did prepare a Land Assessment Book for the year 1920, and did append his affidavit of verification and certificate of verity thereto in the form required by the Charter of Kansas City, and did deliver such book to the City Clerk at his office on March 15, 1920;

"(2) The City Board of Appeals did hold its sessions and did go through the form of performing their duties in respect to such assessment book prior to April 19, 1920.

"(3) The City Clerk did have such assessment book and present the same to or had the same accessible to the Common Council on April 19, 1920, and the City Council did, on April 19, 1920, pass the ordinance fixing the rate of tax levy for 1920, and the same was approved by the Mayor on April 20, 1920, and a certified copy thereof with such Land Book was delivered to the City Auditor on or about April 20, 1920.

"(4) The City Auditor did thereupon go through the form of extending the taxes at the rate specified in said ordinance, in figures and in the appropriate columns on the City's such "Land Book for 1920" on the assessments as thereon shown and the words and figures thereon shown purporting to be the respective assessment valuations as stated in said petition and alternative writ

to have existed and been thereon prior to June 1, 1920, and attached thereto his certificate as required by City Charter dated May 17, 1920.

"(5)   On May 24, 1920, the State Board of Equalization had not completed its labors and the values to be fixed by it for assessment of real estate in Kansas City had not been determined, and for that reason the City Auditor did not deliver the land tax books to the City Assessor, but the same were held until it should be determined whether the State Board increased or decreased the land values, so that if the same were increased or decreased the City Assessor could make an assessment to conform to the values fixed by the State Board, and after the State Board acted the City Assessor did make the assessment conform to the values fixed by said board and thereafter the land tax books were delivered to respondent, Ben Jaudon, City Treasurer.

"(6)   The state and county assessments made as of June 1, 1918, and as of June 1, 1919, were the same except as to the twenty per cent raise in land valuation made by the State Equalization Board on the June 1, 1919, assessment, on June 1, 1920, and the figures of the City Assessor made prior to June 1, 1920, in his books for the city assessment for the year 1920, were the same as such state and county assessment valuations as they were prior to June 1, 1920.

"The Relators were severally the owners of the several tracts of real estate described in their petition, which several tracts of land were entered on said Land Assessment Tax Books and appear to have been so assessed, and the taxes so levied and extended upon said book for the several amounts as originally made prior to June 1, 1920, and later the several amounts were changed after the first day of June, 1920, drawing lines through the amounts of assessment valuations and amounts of taxes shown on such Land Book prior thereto and writing amounts of respective valuations and taxes and increasing the same twenty per cent as to each

tract over the amounts as originally written therein, and that the amounts tendered by the relators to the respondent, Benjamin Jaudon, City Treasurer, on June 30, 1920, were the amounts as shown to be the amount of taxes due severally on their respective tracts of land prior to June 1, 1920, and prior to making such changes on said Land Assessment Book after June 1, 1920.

"(7) In so far as the various city officers could perform their duties in making and completing such purported assessment valuations, purported extentions of the tax levy, and making and delivering said Land Tax Book of 1920, before June 1, 1920, and doing other acts above mentioned before that date, the same all were legally done, and in so far as they could do any of the same on or after June 1, 1920, the same were legally done.

"(8) It is the intention of this stipulation to do away with the necessity of taking evidence in support of the facts alleged in pleadings in this cause and to rest the case upon the question whether the City Assessor could hold in abeyance the city assessment until after the State Board of Equalization had acted, and then to make the city assessment to conform to the values fixed by said board.

"Each party, however, reserving the right to make and present any other contention deemed proper upon the pleadings or this statement.

"There is submitted with this stipulation a true copy of all entries on the Land Book of 1920 relative to one of the tracts of land of Relator Willard N. Munroe, showing the visual appearance of such book as to such tract, and the same is illustrative of such book as to the other tracts of land thereon and therein, and the same respective matters relative thereto appear in such book as to all land tracts therein.

"It is also agreed that the respective officially certified copies of the City Levying Ordinance, of the City Assessor's affidavit and certificate upon and attached to the said Land Book of 1920 and of the City Auditor's

certificate thereto and the verified copy of the City Treasurer's receipt of such book, filed as exhibits with the petition or application of Relator for the writ herein, shall be considered in evidence and as a part of this stipulation.''

There is a slight controversy over the agreed facts, but it is immaterial, as we view the turning question in the case. Upon the pleadings and these agreed facts the case was submitted here.

The first four paragraphs of the agreed facts indicate that the city official was getting his Land Tax Book ready at the dates and within the times prescribed by the City Charter. Under such charter the City Board of Appeals had no right to raise or lower assessments in general.

The crux of the case lies in the fact that after the city assessor had prepared his Land Tax Books for 1920, and after the other agencies of the city had acted thereon, the State Board of Equalization raised the land assessments, in Kansas City, made June 1, 1919, to January 1, 1920, twenty per cent. The city assessor, then raised his assessments twenty per cent, with the result that all land taxes in Kansas City were increased twenty per cent.

By this action, the six named relators, after having tendered their taxes, as they stood upon the book before this raise, ask this court to compel the city and its treasurer to receive the same in full of their city taxes for the year 1920. It is alleged that some $500,000 in taxes are involved by this twenty per cent raise made by the State Board of Equalization. The points made, and the further applicable facts, are left to the opinion. This outlines the case.

I. The charter provisions, the constitutional provisions, and the statutory provisions are all material in the solving of the mixed question here involved. Section 11, of Article X of the Constitution, in so far as here applicable, provides:

State Scheme.

"Taxes for county, city, town and school purposes may be levied on all subjects and objects of taxation; but the valuation of property therefor shall not exceed the valuation of the same property in such town, city or school district for state and county purposes. . . . For city and town purposes the annual rate on property in cities and towns having thirty thousand inhabitants or more shall not, in the aggregate, exceed one hundred cents on the one hundred dollars valuation.''

This case requires the consideration of the State as well as the city, scheme of assessment. We take the State scheme first. By Section 11348 the assessor is re-quired "between the first days of June and January, and after being furnished with the necessary books and blanks, by the county clerk at the expense of the county, proceed to take a list of the taxable personal property . . . and assess the value thereof in the manner following, to-wit: He shall call at the office, place of doing business or residence of each person required by this chapter to list property, and shall require such person to make a correct statement of all taxable property own-ed by such person, or under the care, charge or manage-ment of such person, except merchandise which may be required to pay a license tax, being in any county in this State, in accordance with the provisions of this chapter; and the person listing the property shall enter a true and correct statement of such property in a printed or written blank prepared for that purpose; which state-ment, after being filled out, shall be signed and sworn to, to the extent required by this chapter, by the person listing the property, and delivered to the assessor. Such list shall contain: First, a list of all the real estate and its value, to be listed and assessed on the first day of June, 1893, and every year thereafter, anything in this or any other section to the contrary.''

So that, in each year from June 1st to the following January 1st, there must be listed and' assessed all real estate, and it might be added all personal property, but

such is not here involved.   This assessment so made
forms the basis for the state and county taxes of the
next year, or the year beginning with the January 1st,
upon which the assessment by the assessor is presumed
to close.   Between June 1, 1919, and January 1, 1920, the
County Assessor of Jackson County, in which Kansas
City is located, is presumed to have assessed the real
estate of such county, including said city.  This is to be
done annually as required by this section, and as also
by Section 11371, Revised Statutes 1909.   Section 11392,
Revised Statutes 1909, thus provides:                    •

"The assessor, except in St. Louis City, shall make
out and return to the county court, on or before the
twentieth day of January in every year, a fair copy of
the assessor's book verified. . . .   And the clerk of
the county court shall immediately make out an abstract
of the assessment book, showing aggregate footings of
the different columns, so as to set forth the aggregate
amount of the different kinds of real and personal prop-
erty and the valuation thereof, and forward the same
to the State Auditor to be laid before the State Board of
Equalization."

By Section 11402, a county board of equalization is
provided for each county, but this board, under Section
11403, which defines its power and duties, cannot reduce
the valuation fixed by the State Board of Equalization.

The state board, under Section 11411, shall meet on
the last Wednesday in February, but no time is fixed
for the completion of its work.  The relevant portions of
Sections 11412 and 11414, thus read:

Section 11412 provides:  "The State Auditor shall
lay before the Board of Equalization the abstracts of all
the taxable property in the State  . . .   and the board
shall proceed to equalize the valuation of each class
thereof among the respective counties of the State in
the following manner:  First, it shall add to the valu-
ation of each class of the property, real or personal of
each county, which it believes to be valued below its real

286 Mo.—13

value in money such per centum as will increase the same in each case to its true volume. Second, it shall deduct from the valuation of each class of the property, real or personal, of each county, which it believes to be valued above its real value in money such per centum as will reduce the same in each case to its true value."

Sections 11414 provides: "When the State Board of Equalization shall have completed its labors, the State Auditor shall immediately transmit to each county clerk the per centum added to or deducted from the valuation of the property of his country, specifying the percentage added to or deducted from the real property and the personal property, respectively, and also the value of the real and personal property of his county as equalized by said board; and the said clerk shall furnish one copy thereof to the assessor and one copy to be laid before the annual county board of equalization."

The assessment upon which the State and county taxes for 1920 were to be paid could not be known until the State Board of Equalization had concluded its work. When so concluded, and not before, could be determined the assessed value of lands and other property in Kansas City. Their work from the last Wednesday in February, 1920, to the date of the conclusion of their work, was the thing that finally fixed these property values. Other agencies following must await the action of the State Board of Equalization, before they can fully complete their tax books. These other agencies may have properly fixed their local rates, but they could not fix the assessed value, and the amount of the tax until the conclusion of the work by the State Board, and its certification to the County Clerk, by the Auditor. So that, delay of the State Board may very properly occasion delays of other officials. We are now speaking solely of state and county taxes, and the state agencies dealing with them. So too, as we have before us the land tax for 1920, our remarks should be so limited. So far as the state and county taxes for 1920, in Jackson Coun-

ty, and in Kansas City, as a part of such county, is concerned, it is clear that there was no completed assessment, for such taxes, until after the city authorities had done the things mentioned in paragraph 1, 2, 3 and 4 of the agreed facts quoted, supra. It is also clear that as to state and county taxes, the final value fixed by the State Board, would govern the amounts of the state and county taxes. This discussion we make in advance of the real matter in issue, and as a basis for the discussion to follow.

II. From what has been said county officers must wait the action of the State Board of Equalization, and cannot determine the exact amounts of either state or county taxes due from the respective tax-payers, until such board has completed its work. Not only so, but their action must be upon the assessment made between June and January of the year before the board acts in the completion of the assessment. The course of action under the Kansas City charter is as follows:

City Valuations.

By Section 7 of Article IV (Charter of 1908) the Mayor appoints an Assessor, by and with the consent of the Upper House of the Common Council. By Section 6 of Article V of said charter such city Assessor is required on or before March 15th of each year to make a return to the City Clerk, of "a full and complete assessment of all property, real and personal, in said city on the first day of January next preceding." Real estate is required to be reported in separate volumes. The form of these real estate books is prescribed by Section 11 of said Article V. Section 12 provides for such Assessor's certificate to the books, and the delivery to the Common Council, through the City Clerk. Section 13 provides for a Board of Appeals, and prescribes therefor two meetings annually, the first, for six days, beginning on the 3rd Monday in March, and the second for six days, beginning on the first Monday in April. Section 15 gives the general duties and powers of this board, but in it is

found this clause: "But that said board shall have no power to change the rate or standard of value adopted by the Assessor." It can, however, correct inequalities, and errors, having in view the standard. Section 26 of Article 18 fixes the fiscal year of Kansas City as beginning on third Monday in April. Section 16 of Article V provides that the City Clerk shall present to the Lower House of the Common Council at its first meeting for the fiscal year the assessment books, and that the Common Council shall thereupon proceed by ordinance to levy the taxes for the fiscal year. By Section 17 of Article V it is provided that, on the next day after the ordinance levying the tax has been passed, the City Clerk shall deliver the assessment books, and a certified copy of such ordinance, to the City Auditor. Such Auditor is thereupon required to *forthwith* extend the taxes upon such assessment books, and add thereto the delinquent taxes, and foot up such lists, and then append his certificate. The section then thus proceeds:

"The book containing the assessment upon real estate, when so extended and certified, shall be entitled and called 'Land Book Of ———' (the fiscal year to which applying). The Auditor shall on or before the first day of June in each year deliver the tax book and merchants' licenses for such year to the City Treasurer, taking therefor his receipt in duplicate, which receipt shall state the gross amount of all taxes contained in said book and also the amount of each separate class of taxes, as shown by the footings of the Auditor of the same, one of which receipts the Auditor shall keep in his office and the other he shall deliver to the Comptroller: All this had been done, save and except the action of the Auditor, in preparing and delivering the books.

By Section 21, Article V, if taxes are paid in June a rebate of six per cent is allowed; if in July, four per cent, and if in August, two per cent. Other sections relate to the collection of taxes.

Such is an outline of the city's tax scheme.  There is nothing therein to compel the city to adopt the valuation for state and county taxes.  There is much therein tending to show that it was intended to fit in with the state scheme.  The City Assessor must take as a basis the property on hand as of the first of January, it is true, whilst the State takes the property as of the first of June proceeding.  But even then, the City Assessor, by the Constitution, could not exceed the value fixed for state and county purposes.  The question is what state and county value must be observed?  Evidently the last valuation.  When it is noted that the State Board is required to meet in February, and the City Assessor is not required to act until March 15th, it would appear that the city scheme was intended to fit in with the state and county scheme.  It is clear that the Constitution compels the city officer to accept as a measuring standard the value fixed for state and county purposes. That is to say, he is forbidden to go over that value, and in this way the state and county valuation becomes a guiding standard for such city assessor.  It is argued that the City Assessor need not go as high as the state and county valuation, and can therefore fix his own values, within those bounds.  This may be granted, and should be granted, yet it does not change the fact that there must be a standard fixed by county and state authorities, to limit, if not guide the city assessor.  The question is whether or not it shall be the standard fixed by the State in 1920, or a standard fixed at some previous time.  The Constitution fixes a standard above which the City Assessor cannot go.  That he may go below such standard, so fixed, does not destroy the idea that there must be a standard.  This because the Constitution so indicates. And in my judgment the standard thus fixed by the Constitution means the one upon which the state, county and city taxes are to be paid.  That is, if the city taxes are for 1920, as here, the standard, which limits the City Assessor, must be the state and county values

completed in 1920, for the state and county taxes of 1920. In other words when the Constitution says that the valuation for the city taxes shall not exceed the valuation for the state and county taxes, it means the valuation fixed for state and county, for the year when all these taxes, state, county and city, are to be paid.

III.   But whilst it is true, as we believe—that the Constitution, Section 11, Article X, contemplates, that the standard, above which the city assessor cannot go, is the value of property fixed for State and county purposes, for the same year in which the

**Valid Assessment Before State Board Acts.** city taxes are levied and are to be paid (in this case for 1920), yet this does not settle the instant case. The case is one

of first impression, and the guiding stars are limited. We are forced to a construction of the several applicable constitutional provisions.   Section 11 of Article X says the valuation for city purposes shall *not* exceed the fixed standard of value, above discussed.   As a fact, in this case, the City Assessor's valuation did not exceed the standard, which we conceive to be the one fixed by said Section 11, Article X, of the Constitution, and this constitutional provision does not prohibit a lower valuation by the City Assessor.   Its prohibition is against excess, and not further.   It is true that the assessor did not have before him the correct standard, but when the correct standard lawfully appeared, he was well within its terms.   His action had not violated the Constitution, by having a valuation for the 1920 city taxes, in excess of the valuation for the state and county taxes for the same year.   Had his valuation exceeded the standard, the taxes would, at least, have been invalid to the extent of such excess.   In this connection we should consider Section 10 of Article X which reads:

"The General Assembly shall not impose taxes upon counties, cities, towns or other municipal corporations or upon the inhabitants or property thereof, for county, city, town or other municipal purposes, but may,

by general laws, vest in the corporate authorities thereof the power to assess and collect taxes for such purposes.''

By proper provisions Kansas City has been authorized to assess and collect her own taxes. The method of so doing she has provided for by the charter provisions, to which we have called attention. Unless this charter scheme in some way violates either the State Constitution, or some general law of the State, the scheme must stand..

As previously said, it would appear that the charter scheme was designed to fit into, and articulate with, the state scheme, and only failed in this case, because the State Board of Equalization did not act prior to March 15th, when the city charter scheme required the City Assessor to report his assessment. Had the action of the State Board been, just what it later was, on the day the City Assessor filed his assessment, the city assessment, although lower than the state and county assessment, would have violated *no state law* or state constitutional provision, and would have been valid. And, as we conculde, it was valid, although filed in advance of the report of the State Board, for the reason that after the report of the State Board was made, the city assessment did not exceed the values for state and county purposes. The case then must turn upon other questions, which we discuss later.

IV.. In the foregoing we conclude (1) that the standard by which the city assessment must be measured, in determining its validity, is the state assessment concluded by the State Board of Equalization in 1920, and (2) that the assessment made by the City Assessor, and filed with the City Clerk, was a valid assessment, although filed in advance of the findings by the State Board.

Opening Assessment After State Board Acts.

We are therefore forced to the facts to determine whether or not this assessment so fixed by the City As-

sessor was, in fact and law, the final and only assessment made by such officer. If it was, then it is the basis of the 1920 city taxes upon real estate. This because it was within the standard fixed by the Constitution.

By the 7th clause of the agreed facts it is stated:

"(7) In so far as the various city officers could perform their duties in making and completing such purported assessment valuations, purported extentions of the tax levy and making and delivering said Land Tax Book of 1920, before June 1, 1920, and doing other acts above mentioned before that date, the same all were legally done; and in so far as they could do any of the same on or after June 1, 1920, the same were legally done."

By the 5th clause of the agreed facts it is said:

"(5) On May 24, 1920, the State Board of Equalization had not completed its labors and the values to be fixed by it for assessment or real estate in Kansas City had not been determined, and for that reason the City Auditor did not deliver the land tax books to the City Assessor, but the same were held until it should be determined whether the State Board increased or decreased the land values so that if the same were increased or decreased the City Assessor could make an assessment to conform to the values fixed by the State Board, and after the State Board acted the City Assessor did make the assessment to conform to the values fixed by said board and thereafter the land tax books were delivered to respondent, Ben Jaudon, City Treasurer."

There was no authority for a re-delivery of the books from the Auditor to the City Assessor.

By the 7th clause of the agreed facts it appears that the city agencies had each and all performed their duties, up to the delivery of the tax books to the City Auditor, if as a matter of law, such officers could act at all, prior to the action of the State Board of Equalization. In the previous paragraphs we have ruled that they could

act under their charter powers, and that their acts would be valid, if as a fact the assessment did not exceed the standard thereafter fixed by the State Board. It did not exceed this standard. What might have been the city's situation, if it had exceeded the state valuation, is not for decision in this case. Nor is the question here as to what would have been the city's situation had the city agencies delayed action until after the action of the State Board. Counsel for respondents urge that delayed action would not have invalidated the city assessment, and we think that is true. [St. Louis & San Francisco Ry. Co. v. Gracy, 126 Mo. l. c. 485 & 486; State ex rel. v. Stamm, 165 Mo. l. c. 83; State ex rel. v. Phillips, 137 Mo. 259.]

The question here is, was the Assessor's action completed prior to June 1, 1920? The agreed facts show that the City Assessor did duly deliver his Land Assessment Books to the City Clerk on March 15, 1920. Under the city charter he had then performed his full duties. [Sec. 6, Art. 5, Charter of Kansas City.]

By Section 12 of Article 5, this delivery to the City Clerk is a delivery likewise to the Common Council. There is no authority in the city charter for such assessor to repossess himself of these delivered books, and thereafter make a new and different assessment. His work was completed upon the delivery of the books to the City Clerk and through such clerk to the Common Council. [Secs. 6 and 12, Art. 5, City Charter.] , For this act of the Assessor in re-possessing himself of the books, and making therein a new and different assessment, the respondent should be able to point to the authority for such act. He has not done so, and cannot do so. The books as delivered by the City Assessor to the City Clerk on March 15, 1920, with the land values therein, are the books to control the city taxes for 1920. The subsequent attempted assessment is void, as being unauthorized either by charter or law. This must be true for the reason that the city scheme provided for a Board

of Appeals. To this board the taxpayers could at least go for the corrections of irregularities and mistakes in the Assessor's work. To say that after all the city agencies have acted (as they had here) the City Assessor could re-possess himself of the books and make a new assessment would preclude the taxpayers after the final assessment from his right to go to the City Board of Appeals, which is a valuable legal right. This right the city charter gave him, and this right was cut off by the action in this case. When all the city agencies having to do with the city assessment had acted, the city assessment had closed, and could not be re-opened. All agencies had acted in this case, because the duties of the Auditor were the pure ministerial duties of extending the taxes upon the assessments and the delivery of the books to the Treasurer. He had no part in the assessment.

V. It is urged by the city (1) that in a mandamus proceeding, such as we have here, there is an improper joinder of the six relators in this case, and for that reason we should quash the alternative writ, and (2) that, as to the unnamed relators, other taxpayers of the city, there is no allegation of a tender of the admitted legal taxes. The latter contention is true, and such taxpayers have no place in this case. There is no allegation as to tender, so far as they are concerned, and as to them no mandate can go in this case. This allegation may, however, be treated as surplusage in the petition and alternative writ, and leave the petition and alternative writ good, as to the six relators who have pleaded tender. As to them the sole question is, whether or not they have been improperly joined as relators.

*Mandamus: Relators.*

These six taxpayers are in the identical, and same position, so far as the general proposition involved is concerned. Under the general proposition of the invalidity of the twenty per cent additional tax is concerned, their interests are absolutely identical. If the

case was by injunction, and not by mandamus, there would be no question as to the proper joinder of these parties, as parties plaintiff. Whilst the individual relator, so far as the amount of taxes is concerned, might have a personal and individual interest, yet in the vital issue, i. e. as to whether or not this added twenty per cent is legal, they have the same and identical interests. The amounts of their respective taxes are but mere incidents to the main question. That main question is, whether or not, in law, the city had the right to add this twenty per cent of additional taxes. These relators are alleged to be taxpayers, who had tendered their alleged legal taxes, and who jointly sought to have this single issue (whether not the twenty per cent added) was legal or illegal. In this simple issue they were jointly interested, and it is the issue of this lawsuit. The strict common-law rules of mandamus have been much relaxed in more recent years, as will be shown by the cases entertained by this court

Whilst the exact point here made was not raised, yet, in State ex rel. Wahl v. Speer, 223 S. W. 655, we entertained mandamus on the relation of divers taxpayers, against the County Court of Pemiscot County. We not only entertained it, but granted the permanent writ. It is true that these taxpayers had a common interest in the thing that they sought to have done. Again in State ex rel. Rutledge v. St. Louis School Board, 131 Mo. 505, we entertained and granted to the relators (divers taxpayers) our writ of mandamus. The only distinguishing features between those cases and the case at bar is, that these six relators may have tendered different amounts of taxes. It is not denied that their tenders were sufficient, if the March 15th assessment stood, so that the respondent here singles out the single question, whether or not this increase was legal. In fact the return admits the tenders, but only questions the insufficiency thereof on the theory that the March 15th assessment was not good. The respondents there-

204    SUPREME COURT OF MISSOURI.

State ex rel. Iron Mountain Ry. Co. v. Reynolds.

fore make a case of a single issue, in which all of the six relators are equally and jointly interested. Under these facts we rule that they were and are entitled to the peremptory writ of mandamus as prayed. The writ is so ordered. All concur.