**DEFENDERS' TOWNHOUSE, INC., a Not-for-Profit Corporation, Respondent,**

v.

**KANSAS CITY, Missouri, a Municipal Corporation, Goldie Horner, Ilus W. Davis, Rollin Agard, J. D. Robins, Sal A. Capra, Jeffrey Hillelson and Frank Brennan, Appellants.**

No. 53830.

Supreme Court of Missouri,
Division No. 2.

May 12, 1969.

Motion to Transfer to Court En Banc or for a Rehearing Denied June 9, 1969.

James E. Grier, Kent E. Whittaker, Kansas City, for respondent; Brewer, Myers, Beckett & Grier, Kansas City, of counsel.

Herbert C. Hoffman, City Counselor, L. B. Saunders, Associate City Counselor, for appellants.

BARRETT, Commissioner.

Defenders' Townhouse, Inc., a Kansas not-for-profit corporation, owns and operates a housing facility at 922 Linwood for persons over 62 years of age. For the years 1965, 1966 and 1967 Kansas City, a constitutional charter city through its taxing authorities, City Assessor, City Board of Equalization and City Board of Delinquent Tax Adjustment, assessed and levied ad valorem taxes on Defenders' property of $5595.67, $5079.14 and $4563.-68, a total of $15,238.49. Claiming that its property was used "exclusively * * *

for purposes purely charitable" and was therefore exempt from taxation, Const.Mo. Art. X, Section 6, V.A.M.S.; RSMo 1959, § 137.100, V.A.M.S., and failing to secure relief from the city, Defenders' Townhouse instituted this action against Kansas City and its officials. Six counts of Defenders' petition seek a declaratory judgment and an injunction against the assessment and collection of the taxes. In three counts 3, 6 and 9, it was stated that because the county exonerated it from state and county taxes for those years, the city's levy and assessment violated Article X, Section 11(a) of the constitution providing that counties and "other political subdivisions" may levy taxes "but the assessed valuation therefor in such other political subdivisions shall not exceed the assessed valuation of the same property for state and county purposes." The city made full answers to all claims and allegations asserting chiefly that Defenders' Townhouse was not operated and used for charitable purposes but was operated for profit and therefore was subject to taxation. In addition, in three counts the city counterclaimed for its taxes. The trial court found for Defenders on all six counts relating to declaratory relief and injunction, it found against Defenders, however, on the three counts under Section 11(a), Article X of the constitution thereby finding and decreeing that if the property was not exempt from taxation the city had lawfully and properly assessed the property and levied the tax. The court of necessity found against the city on its counterclaims for the taxes. The city only has appealed and thus presents the decisive issue of whether respondent's property is exclusively used for purely charitable purposes and is therefore exempt from taxation.

As stated, Defenders' Townhouse is a Kansas corporation of 10,000 shares with a capital of $10,000.00 and formed for the sole purpose of managing, owning and operating the facility involved here. Defenders' Townhouse was caused to be incorporated by Defenders of the Christian Faith, the sole shareholder and contributor of all the capital of Townhouse. The articles of incorporation bylaws and other material relating to Christian Faith are not set out but Dr. Armstrong who is currently president of both organizations testified that it was formed in 1925 by a group of ministers to "work among all churches" and "to defend the historic faith of Christianity and the Bible beliefs." It is not affiliated with any recognized church denomination, Dr. Armstrong said, "we are an interdenominational church ministry." He had only recently been affiliated with Townhouse but he said that his predecessors "undertook working among the aged" and in connection with Townhouse said, "We do not urge anything or we do not force anything upon these people, but we make available to them our spiritual assistance. We make available to them regular meetings in our chapel." He said that he and other ministers were available "to counsel with them—to assist them in any way possible. We feel this is a very rewarding ministry, and it is very important." The officers of the two corporations are overlapping and the salaries and expenses of the president and secretary-treasurer of Townhouse in excess of $25,000.00 were paid by contributions received by Christian Faith. It was stipulated that all payments on Townhouse indebtedness had been made by contributions received by Christian Faith and that "Christian Faith as a condition to obtaining the loan (an FHA loan to Townhouse of $1,116,000.00) has agreed to subsidize by charitable contributions any and all deficiencies arising from the operations of the Defenders' Townhouse." It should be noted that any contracts or arrangements as to the precise financial relationships between Townhouse and Christian Faith are not mentioned or set out.

These particular facts with respect to Christian Faith are interpolated and detailed for the purpose of making and emphasizing an important distinction. Christian Faith is not a party to this litigation. Despite their close relationship the action was instituted and prosecuted by Defend-

ers' Townhouse and the question is not whether Christian Faith is entitled to an exemption by reason of property "used exclusively for religious worship." Const. Mo. Art. X, Sec. 6. And in this connection counsel for Defenders' Townhouse make no claim to an exemption by reason of religion. Thus the appeal is not concerned with the exemption of a religious body or the force and effect of property devoted to a combined religious and secular use. Annotation 168 A.L.R. 1222, 1235; Evangelical Lutheran Synod v. Hoehn, 355 Mo. 257, 196 S.W.2d 134. Again, it should be emphasized, the problem as briefed and argued by the parties is whether Defenders' Townhouse is exempt from taxation for the reason that it is used within the meaning of the constitution and the statute "for purposes purely charitable."

Also preliminarily to detailing the circumstances in which the problem is to be resolved the Missouri cases dealing with the general subject of charitable immunity from taxation should be noted. In this connection there have been no cases in Missouri involving the tax immunity of residences or facilities for the aged. While Evangelical Lutheran Synod v. Hoehn, noted above, involved religious and charitable problems it has become a leading case in certain respects and furnishes some more or less permanent guidelines in a field of changing concepts of both religion and charity. It was there held that the Lutheran Synod's vast publishing business, Concordia Publishing House, was not exempt from taxation as either a religious or charitable enterprise. It was conceded that the primary objective of both organizations, the church and the publishing business, was primarily religious, nevertheless, it was laid down as a principle that "religious or charitable institutions cannot enter the field of business and operate for profit." (196 S.W.2d 1. c. 143.) The earlier YMCA cases and the Salvation Army case were reconciled but certain basic concepts were not modified. In Salvation Army v. Hoehn, 354 Mo. 107, 188 S.W.2d 826, the Sal-

vation Army, an Illinois not-for-profit corporation, acquired at a foreclosure sale for $108,000.00 the 13-story Robert E. Lee Hotel in St. Louis and converted it into Evangeline Residence for single employed women. The details of the operation of the residence, rentals, services, meals are all set out and it was established that there was no intention or effort to make a profit and for the years involved, 1941–1943, the enterprise operated at a loss "made up from the general funds of the Salvation Army." It must be noted that the Salvation Army itself owned and operated the residence and was the only party to the suit. The earlier YMCA cases (State ex rel. Koeln v. St. Louis YMCA, 259 Mo. 233, 168 S.W. 589; State ex rel. St. Louis YMCA v. Gehner, 320 Mo. 1172, 11 S.W.2d 30; St. Louis YMCA v. Gehner, 329 Mo. 1007, 47 S.W.2d 776, 81 A.L.R. 1449) were again reconciled or distinguished but of those particular cases the court said, "Exemption from taxation was properly denied because a part of the building was concededly used for purposes purely commercial." At another point it was observed "that the YMCA, in effect, was 'conducting hotels or boarding houses' for pay, and rendering other services for which it made charges, the barber shop, tailor shop, soda fountain, swimming pool, etc. In other words, the holding was to the effect that the services, even though wholly without profit, were not *exclusively and purely* charitable." The second and third YMCA cases were criticized as "too strict, that is, not reasonable" and confined the concept of charity "solely to the relief of the destitute, and excludes all humanitarian activities, though rendered at cost or less, which are intended to improve the physical, mental and moral condition of the recipients and make it less likely that they will become burdens on society and make it more likely that they will become useful citizens." When the fourth YMCA case, forty years after the first one, Young Men's Christian Ass'n v. Sestric, 362 Mo. same property and facilities came to the

court the earlier cases were again reconciled in part but upon the basis of the intervening decisions in Young Women's Christian Ass'n v. Baumann, 344 Mo. 898, 130 S.W.2d 499, (the fourth YMCA case) and Missouri Goodwill Industries v. Gruner, 357 Mo. 647, 210 S.W.2d 38, exemption was granted because in those cases it was said, "the uses made of the properties were intimately connected with the accomplishment of the purely charitable purposes of the organizations and because the uses themselves did not have for their purposes the making of profit. A distinction should be clearly made between such situations and one in which there is use of property, the purpose of which use is to make profit, even though the profit is made for the express purpose of being used, and is used, to further and accomplish a purely charitable purpose. And this is true even though the use of the property may be said to be reasonably connected with the purely charitable purposes of the corporation." Even though these concepts may change, the Sestric case established three valid rules applicable here: one, "whether a particular facility made a profit or suffered a loss for any particular year, the fact of such profit or loss and the amount thereof, would simply be evidence (and in many circumstances, most persuasive evidence) on the proposition of whether the purpose of the use was to make profit," two, "each year's tax is a separate transaction and each action relating to each year's tax is a new cause of action" and, three "(e)ach of these tax exemption cases is peculiarly one which must be decided upon its own particular facts."

In addition to these decisions it remains only to consider the hospital cases even though it is possible that all general hospitals for the treatment of the sick could be placed in a separate or special category. Albeit as to hospitals the basic test of charitable within the meaning of the tax exemption has been whether the institution or facility was maintained for profit or as a nonprofit general hospital for the treatment of the sick. Bethesda General Hospital v. State Tax Commission, Mo., 396 S.W.2d 631, represents the broad changed concept of charity and facilities falling within the exemption. It was there held that seven residential properties occupied rent free by paid personnel, some with salaries in excess of $1000.00 a month, were used exclusively for charitable purposes. There it was again said that each tax-exemption case depended on its particular facts and in that case the facts were conceded and there were no inferences to be drawn. The basic test applied was that the exemption was "given in return for the performance of functions which benefit the public * * * that the exemption in favor of the charitable institutions is based upon the ground that a benefit is conferred upon the public by them, with consequent relief, to some extent, of the burden imposed upon the state to care for and advance the interests of its citizens." (396 S.W.2d 1. c. 633–634.) Just a year before, Frisco Employes' Hosp. Ass'n v. State Tax Commission, Mo., 381 S.W.2d 772, a nonprofit association ran afoul of the basic tests in that its facilities were available only to dues-paying members and were not available to the general public. In the most recent case of Community Memorial Hospital v. City of Moberly, Mo., 422 S.W.2d 290, the Missouri cases were again collected and reconciled and while the basic test of whether maintained for profit was applied the decision indicates why general hospitals for the treatment of the sick may stand apart from other institutions. In any event the history of the hospital and all the facts and circumstances were carefully examined and it was concluded that "the stated evidence satisfies all the rules and requirements necessary to respondent's exemption from taxation for the years in question on the ground its property was actually and regularly used for purposes purely charitable and not for private or corporate profit." Certain significant factors were noted as circumstances but not determinative—whether there was a profit or loss, some competition with private busi-

ness, pay patients admitted for treatment, a large part of its revenue derived from pay patients because "from all the evidence, it may be fairly said that the actual use made of the corporation's property is consistent with the nonprofit features and charitable purposes expressed in the corporation's articles of agreement." In connection with the Missouri cases and particularly in connection with the immediate case it should be noted that "(o)ne ground on which a statute exempting charitable institutions from taxation can be justified in the constitutional sense is that these institutions administer to human and social needs, which the state itself might and does undertake to do, so that *the ultimate obligation of the state is thus discharged by the private charity.*" Annotations 34 A.L.R. 634, 635; 62 A.L.R. 328; 108 A.L.R. 284.

In addition to the circumstances previously noted, on October 15, 1963, Defenders' Townhouse, Inc., purchased the La Salle Hotel on Linwood Boulevard for $545,938.41. The purchase was accomplished by paying $20,000.00 in cash and the assumption of all mortgage obligations. By August 1964 Townhouse obtained an FHA guaranteed loan of $1,116,000.00, at 5¼% interest on the unpaid balance until March 1, 1966, and thereafter level monthly payments of $6687.61 a month for 25 years. At the end of the mortgage period Townhouse, presumably, will own, debt free, a building worth more than $1,000,000.00. Upon receipt of the loan Townhouse paid off all mortgage indebtedness and remodeled and rehabilitated the hotel, adapting it to use as a retirement house, at a cost of $1,232,375.31. In applying for the FHA loan respondent submitted a plan of operation estimating annual income from operating the facility as a home for the aged. The estimated income, computed at 90% occupancy, was $316,872.00, with operating expenses of $205,900.00, annual fixed charges of $77,317.00, leaving $33,655.00 for taxes and surplus. A proposed plan of operation for three years was also submitted to FHA on the basis of 60%, 70% and 93% occupancy for those years and this showed a net return of $49,388.00, $72,626.00 and $126,073.00, respectively. It was stipulated that "in actual operation of Defenders' Townhouse property (exclusive of service income and expense), the percentage of occupancy, gross income, operating expenses and net return (loss) before payment of principal and interest on indebtedness have been:

| Year | % of Occup. | Gross Income | Operating Exp. | Net Return |
|------|-------------|--------------|----------------|------------|
| 1st | 38 | $85,637.97 | $161,059.67 | ($75,421.70) |
| 2nd | 40.5 | 92,843.58 | 157,335.82 | ( 64,492.24) |
| 3rd | 76 | 186,038.59 | 181,779.84 | ( 4,258.75)" |

———◆———

It should be added, perhaps, that FHA approves rental rates and by rule regulates profits and occupancy.

The president said that there were "about two hundred people," age 62 and over, "in our care." The stipulated lists of occupants in a 202 unit facility, not counting husbands and wives or those sharing rooms, showed 96 for 1965, 122 for 1966 and 170 for 1967. The rent paid was from $75.00 to $145.00 per room a month. The rental sheets may indicate that a few, respondent says 15%, residents were "accepted on a rent-reduced basis." The president said that he hoped the facility "could be brought to the place where it would pay for itself. I would say right now I don't have too bright a hope on it." It would appear from the listing of the occupations of some of these people, "Saleslady," "Wilcox Electric," "Bank Clerk," "Bookkeeper," "Clerk," and "Board of Trade" that they are not all retired. In addition to the rooms guests were provided with 24-hour switchboard service,

watchcare service, the presence of a nurse, films, games, lectures, library, "room food service for those temporarily indisposed," "complete maid service once a week, and linen and towels." At "the option of the residents" three meals a day were available for an additional $55.00 a month. In connection with rentals, unlike some of these institutions elsewhere, there were no "entrance or founder's fee (contracts) or any life care contracts." For one or more of the three years space was rented for a chiropractor's office, $150.00 a month, a barber shop, $70.58 a month and a beauty shop, $125.00 a month, but these rentals have since been discontinued. Also atop the building and completely unexplained is a structure "some sort of an answering radio program." The president said "it doesn't belong to us—something they have put up there. I understand that that's the highest point in the county, and that's why they wanted to use it." (It should be interpolated, having mentioned these latter circumstances that they are not considered as having any decisive bearing in the end result.)

A circumstance relied on and stressed by Townhouse is that beginning with 1965 it has been exempted from state and county ad valorem taxes by the Jackson County Board of Equalization, it has also been exempted from state and federal income taxes, Missouri sales taxes, employment security payments and even Kansas City occupation taxes. However, the assessed valuation of $271,660.00 in 1965 was fixed by the county taxing authorities and subsequently used by the city. Certain records, documents and depositions of other institutions and facilities, on the assumption that they are comparable situations and exempt, were introduced. These were Our Lady of Mercy, a combined retirement and nursing home, the Kansas City Lutheran Home and Hospital Association and the Montabaur Club operated by the Brothers of Mercy. There is other evidence, the articles of incorporation showing a nonprofit purpose and many other circumstances but these are sufficient to illustrate the basic problem involved.

The parties have cited no cases from other courts but the problem involved here is of concern and importance, the statutory and constitutional provisions being quite similar in language and purpose, to the fifty states as well as to all local taxing units and how other jurisdictions have met and resolved the problem is not only significant but relevant and persuasive. The magnitude of the problem as applied to various facilities for the aged suggests, as with general hospitals perhaps not only a case to case basis but a particular facility or institution, here in the language of its articles of incorporation "to provide elderly persons with housing facilities and services specially designed to meet the physical needs of the aged." Indicative of the increasing complexity and seriousness of the problem is the large number of recent cases in other jurisdictions. The Ohio court in denying an exemption to apartments for "aged and needy self-respecting persons of good character" and in applying the rule that "(e)xemptions, even charitable ones, must be strictly construed" made this observation: "An estimated 13 percent of the total property in Ohio is already exempt." Philada Home Fund v. Board of Tax Appeals, 5 Ohio St.2d 135, 214 N.E.2d 431, 433. The Supreme Court of Texas in denying a tax exemption to "a home for older adults," formed and operated under the auspices of the Southwest Texas Conference of the Methodist Church with an FHA loan, indicated that there was a division of opinion among the states, California, Minnesota and Kansas, to which Indiana, Montana and Pennsylvania should be added, allowing the exemption with Ohio, Nebraska, Florida, New Mexico, Oregon and Louisiana denying an exemption. Hilltop Village, Inc., v. Kerrville Ind. Sch. Dist. (Texas) 426 S.W.2d 943, 947. It may well be that in basic philosophy there is an irreconcilable conflict and yet, with the possible exception of Minnesota in Assembly Homes, Inc. v.

Yellow Medicine County, 273 Minn. 197, 140 N.W.2d 336, in the cases allowing an exemption there are certain significant factors which readily distinguish this case factually and perhaps permit of a reasonable reconciling rationale with the cases denying a charitable tax exemption.

In addition to a broadened concept of "charity," as applied to all people over 65, a "home is meeting the needs which gerontologists state must be provided the aging, namely: relief of loneliness, boredom, decent housing that has safety and convenience and is adapted to their age, security, well-being, emotional stability, attention to problems of health, etc.," in the Indiana case, State Bd. of Tax Commissioners v. Methodist Home for Aged, Ind.App., 241 N.E.2d 84, for example, the home was constructed under the auspices of the Methodist Church. The home was constructed on a 40-acre tract of land "received as a gift" from the Grace Methodist Church of Franklin and the Franklin Chamber of Commerce and "one-half of the cost of the first unit of the home was furnished by the 600 member churches of the Indiana Conference of the Methodist Church." In the Pennsylvania case, In re Tax Appeals of United Presbyterian Homes, 428 Pa. 145, 236 A.2d 776, "Presbyterian Homes was established by the Huntingdon Presbytery from gifts and contributions made by its members and friends." And, "A fund-raising campaign raised in excess of $340,000." In addition, in that case there does not appear to have been the usual FHA financing. The significant factor in those two cases, unlike the present appeal, is that initially the homes for the aged were established by substantial gifts, not by purchase and amortization of indebtedness. Likewise in the first California case, Fifield Manor Wilshire v. County of Los Angeles, 188 Cal.App.2d 1, 10 Cal.Rptr. 242, even though it is a disservice to the court to reduce an exhaustive, documented opinion to a one-sentence report, "These institutions

sprang from the benevolent aspirations of Mrs. Helen R. Fifield, wife of the Pastor of First Congregational Church of Los Angeles. Under her leadership members and friends of the Church, mainly persons who desired to live in a home for the aged such as Mrs. Fifield had envisioned, contributed enough money to the charitable corporation formed for the purpose, Fifield Manor, to enable it to buy Chateau Elysee Apartments and to convert it into a home for the aged." Perhaps that court's broadened concept of "charity" should also be noted: "it seems clear that a home for the aged *which caters to wealthy persons* and furnishes them those services and care needed by the old and infirm, rich or poor, does not cease to be a charitable institution so long as its charges do not yield more than actual cost of operation." And see by the same judge and the same court of appeals Samarkand of Santa Barbara, Inc. v. County of Santa Barbara, 216 Cal. App.2d 341, 31 Cal.Rptr. 151 and plainly a truly "charitable" facility, a temporary low-priced residence facility for furloughed missionaries. House of Rest, etc., v. County of Los Angeles, 151 Cal.App.2d 523, 312 P.2d 392. Following and applying California's broad definition of "charity" which applies "to the poor as well as to the rich" is Topeka Presbyterian Man. v. Board of County Com'rs., 195 Kan. 90, 402 P.2d 802. A frequently cited if not leading case in this category is Bozeman Deaconess Foundation v. Ford, (Mont.) 439 P.2d 915. The institution involved there was not alone a housing facility for the aged, its purpose was "for the care of the retired or aged or chronically ill" but the broader test of charity was recognized "under circumstances where the fullness of their life is promoted and imposition of the frailties of declining years are spared their children, relatives and the public authorities." While not the decisive factor Montana's statutory definition of "charity" included facilities for the care of the retired or aged or "chronically ill." In this appeal a nurse was on duty at Townhouse but it was not

equipped to care for the "chronically ill" and was in no sense a nursing home or an institution providing custodial care for the senile.

If the suggested factors are not sufficient to distinguish the cases granting tax immunity the cases denying the exemption, while recognizing, as in Missouri, a broader concept or perhaps more accurately a concept adapted to changed conditions, emphasize certain significant factors not mentioned or minimized in the cases extending the meaning of "used exclusively * * * for purposes purely charitable." In the Ohio case mentioned earlier two factors were noted, one "that property partly or incidentally used for private residence is non-exempt as not used exclusively for charitable purposes" and two, as applied to the immediate circumstances "it would appear clear to us that the prospective beneficiaries of the charitable Fund in question are so insufficiently defined by the broad classification, 'aged and needy,' as to make the denial of exemption reasonable and lawful even under the broadest possible application of Section 5709.12, Revised Code." (214 N. E.2d 1. c. 432, 434.) This view was again adopted in Crestview of Ohio, Inc. v. Donahue, 14 Ohio St.2d 121, 236 N.E.2d 668. In the Texas case mentioned above, 426 S. W.2d 943, a broader concept of "charitable" was recognized and as in the Missouri cases it was conceded that the fact of paying guests and the furnishing of incidental services, even a beauty shop, a canteen and visitors' facilities, did not destroy the character of the facility. Nevertheless, the Texas court in denying the exemption observed that "All of the courts appear to pay homage to the rule that tax exemptions are subject to strict construction since they are the antithesis of equality and uniformity." Also the Texas court recognizd the difference in a facility in which "aid is dispensed to those in sickness or distress, 'without regard to poverty or riches of the recipient' and 'the funds, property and assets of such institution are placed and bound by its laws

to relieve, aid and administer' to the relief of those in want, sickness and distress." But as to the FHA financed Methodist "home for older adults" the court adopted the view "that the occupants of the homes were the principal beneficiaries rather than society in general, and that society was not relieved of responsibility for persons in need." Specifically and as in Defenders' Townhouse the court said, "it is apparent that Hilltop Village is not accepting residents without regard to their financial circumstances nor is it bound to assume charitable obligations or to engage in dispensing relief to those in need. The requisite elements of dedication and use in fact of its properties are not present. There is no assurance that society is being or will be relieved of the care and expense of those in need. This is not to say that all residents must be indigent or that the acceptance of payment from some will defeat tax exemption. It is to say that the institution must be one whose properties and assets are pledged in perpetuity to the relief of persons in financial need and to their assistance in obtaining the care they must have to prevent their becoming a burden on society."

The Florida court, Haines v. St. Petersburg Methodist Home, Inc., Fla.App., 173 So.2d 176, made the preliminary observation that "There has been a conspicuous increase of corporate projects of a charitable or quasi charitable nature" and that "The fact situations in this field have multiplied in variety and complexity as well as number." The court then considered the problem in depth including the seven points of inquiry suggested by the Oregon court and concluded that "the plaintiff is substantially recompensed its expenditures by these very residents who are not shown to be charity cases in the sense necessary to sustain the plaintiff's suit. * * * We thus conclude that the plaintiff, though altruistically motivated and serving a socially constructive purpose, is nevertheless a financially viable institution whose proper-

ty is not entitled to exemption from taxation." While Oregon by a divided court, as in many of the decisions, finally adopted the rule "that in order to cloak property with the charitable exemption it is essential that the property be donated by others and not purchased by the users of the property in consideration for being granted such use" (Friendsview Manor v. State Tax Commission, 247 Or. 94, 420 P.2d 77, 81) also emphasized the presence or absence of six factors in determining whether a facility or institution "is or is not in fact eleemosynary." And again the circumstances were examined in detail and the cases all collected in finally denying tax exemption for the reason stated as to the Manor founded by the Quakers, 420 P.2d 1. c. 82, "(i)ts residents are largely persons who can financially fend for themselves, either collectively or individually, and the government would not be required to provide housing for them." Oregon Methodist Homes, Inc. v. Horn, 226 Or. 298, 360 P. 2d 293. Incidentally, the American Association of Homes for the Aging appeared as amicus curiae in the Friendsview Manor case. The Louisiana court in denying an exemption even to a hospital refinanced and remodeled into a "Class A–1 Nursing Home" emphasized "that the sine qua non of entitlement to the exemption is the actual practice of the enterprise or undertaking." In Nebraska a twelve story building with 132 one-room efficiency apartments, FHA financed and sponsored by the Omaha Education Association, was denied tax exempt status. It was first pointed out that OEA Senior Citizens, Inc., was not owned or used for religious purposes, and neither was it used or owned exclusively for educational purposes. And while it was not owned for profit one factor pointed out was that "in design the purpose was that each occupant should be charged his or her part of operation, maintenance, and the amortization of the mortgage on the property, and for the cost of the meals taken."

In this weltering maze of cases one of the most persuasive is Mountain View Homes, Inc., v. State Tax Commission, 77 N.M. 649, 427 P.2d 13. Thereafter emphasizing, as do the Missouri cases, that the ultimate criterion for exemption is use, that is whether the property is used for charitable purposes, the court made these convincing observations, some of which may or may not be true here:

"True, no one makes a pecuniary profit, and certain persons and families who may be described as 'low income,' 'workers,' 'aged' or 'underprivileged' are provided better housing at lower prices than would otherwise be available to them. A benefit is thus bestowed. However, the recipients are certainly in no sense sick or indigent, and we would venture that most would be surprised to learn that they are considered as being proper objects for, or as recipients of charity. There is nothing in the record which indicates that any are welfare clients, or are permitted to occupy apartments without payment of the established rental. Neither is there any element of fraternity, brotherhood or good fellowship intended to improve the spirits or impel to renewed effort. It is clear that rents are fixed at an amount necessary to pay the interest, amortize the principal and pay all expenses of maintaining the property. By what theory this should not include taxes on the same basis as other comparable properties is not clear to us. That the federal government does not tax the income derived from the property is in no way persuasive. Here, we have an enterprise to furnish low-cost housing to a certain segment of our population. It was intended to be self-supporting, without any thought that gifts or charity were involved. The tenants are required to pay for the premises occupied by them with the rentals being fixed so as to return the amount estimated as being necessary to pay out the project. It is competitive with landlords

offering other residential property for rent and on which taxes must be paid. Also \* \* \* there was no evidence that the public is relieved of any expense in comparison with the loss of tax revenue."

■ It is not necessary to again review the details of the Townhouse operation and demonstrate, or to nicely balance the pros and cons or reasons of the cases and give weight to the various factors; as indicated throughout the discussion this facility, particularly its use, does not fall within "purposes purely charitable" and therefore is not exempt from taxation.

■ Townhouse has a further point in support of the court's decree, that its property is exempt from taxation because Article X, Section 11(a) of the Constitution prohibits the city assessment from exceeding the "exempt" assessment of the state and county for the years 1965, 1966 and 1967. Section 11(a) provides that "Taxes may be levied by counties and other political subdivisions on all property subject to their taxing power, *but the assessed valuation therefor in such other political subdivisions shall not exceed the assessed valuation of the same property for state and county purposes.*" In the first place the italicized provision is wholly unlike the Texas constitutional provision of the 1890's that " 'the occupation tax levied by any county, city, or town for any year on persons or corporations pursuing any profession or business, shall not exceed one half of the tax levied by the state for the same period on such profession or business.' " The Texas court held that the "purpose of so much of the constitution as is quoted was evidently to place a limitation on the power of municipal corporations to levy and collect occupation taxes; to deny to them the unrestricted power to tax any occupation." Hoefling v. City of San Antonio, 85 Tex. 228, 20 S.W. 85, 16 L.R.A. 608. In the second place a completely accurate statement of fact is that as the par-

ties stipulated "for the year 1965, the Assessor of Jackson County, Missouri, assessed the Defenders' Townhouse property at a valuation of $271,660.00; that, thereafter, upon the application of Defenders' Townhouse, the Board of Equalization of Jackson County, Missouri, ruled that the Defenders' Townhouse property was exempt from ad valorem taxation for 1965 based upon that Board's interpretation of Article X, Section 6, of the Constitution of the State of Missouri of 1945, and of Section 137.100 RSMo 1959." Thereafter the Assessor of Jackson County, based on the action of the Board of Equalization exempted the property from 1966 and 1967 taxes. The city has not adopted an assessed valuation in excess of the state and county valuation, on the contrary, as also stipulated Kansas City "has levied an assessment against the Defenders' Townhouse property for the year 1965 at a valuation of $271,660.00"—identical with the county's valuation. Kansas City made the same assessment for 1966 and 1967 but Kansas City, upon the application of Townhouse, refused to follow the ruling of the county board and refused to grant the exemption. In this background Section 11 (a), Article X, has no application and is not involved upon this appeal. 51 Am.Jur. (Taxation) Sec. 750, p. 688; 84 C.J.S. Taxation § 402, p. 766; City of St. Joseph v. H. & St. Jos. R. Co., 39 Mo. 476; State ex rel. Flaugh v. Jaudon, 286 Mo. 181, 227 S.W. 48. This is aside from the fact alone that if as indicated the property is not exempt it is immaterial that one taxing unit has seen fit to insist upon an assessment and levy while another unit has seen fit for reasons of its own to grant an exemption. The fact that federal and state agencies have seen fit to exempt the facility from income or other taxes is likewise immaterial to the issues involved upon this appeal, particularly upon the issue of whether in the constitutional sense it is "used exclusively \* \* \* for purposes purely charitable" and is therefore "exempt from taxation." County of Douglas

v. OEA Senior Citizens, Inc., 172 Neb. 696, 111 N.W.2d 719, 1. c. 727; Haines v. St. Petersburg Methodist Home, Inc., (Fla. App.) 173 So.2d 176, 1. c. 183.

Upon consideration of all the reasons indicated the judgment is reversed.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.