OEA SENIOR CITIZENS, INC., A CORPORATION, APPELLANT, V. COUNTY OF DOUGLAS, STATE OF NEBRASKA, APPELLEE.
185 N. W. 2d 464

Filed March 26, 1971. No. 37649.

594

Leo Eisenstatt and Daniel B. Kinnamon of Eisenstatt, Higgins, Miller & Kinnamon, for appellant.

Donald D. Knowles, Arthur D. O'Leary, Harold H. Zabin, and Paul F. Peters, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

SPENCER, J.

This is an appeal from the denial of tax exempt status to OEA Senior Citizens, Inc., for a retirement home for the aged operated by appellant, known as OEA Manor, hereinafter referred to as Manor. We affirm.

This case is essentially a retrial of the same issues presented in a 1961 case between the same parties. County of Douglas v. OEA Senior Citizens, Inc., 172 Neb. 696, 111 N. W. 2d 719. Appellant urges the previous decision is no longer controlling because of material changes in the use of the property as well as changes in our con-

struction of the applicable law in other cases subsequent to that decision.

While the previous action was disposed of on a motion for summary judgment, a review of the pleadings and evidence was extensively incorporated into the opinion. It is true that in some respects the operation of Manor has been expanded, but these expansions were in some measure considered in the previous case. We incorporate herein by reference the description of the status of appellant and its parent corporation, Omaha Education Association, hereinafter referred to as OEA, as well as the details of its organization and a description of the building and its method of operation. Since 1961 the operation of Manor has been turned over to managers who have been paid for their services, and unlike the previous case none of the residents are on county welfare.

One of the important developments since 1964 on which appellant predicates its contention is the establishment of a health center in 12 units on the second floor, hereinafter referred to as Center, under the direction of a registered nurse. Previous to this time there was a practical nurse living in Manor, but there was no medical care center. There are no surgical facilities of any nature in the building. Center provides hospital-type nursing care for residents, but if anyone becomes seriously ill she is transferred to a hospital. Center does not have any doctors on its staff. All medical services other than those embraced by the term "nursing care" are rendered by the resident's own doctor. While Center is maintained for the welfare of residents, all services rendered therein and by its personnel are billed to those receiving such services. Charges are also made for any services rendered by the staff of Center in other parts of the building, such as giving of shots, tub baths, or helping a resident from her room to the dining area. No drugs are administered except on the order of the doc-

tor for the resident, and no drugs are furnished by Center.

Manor maintains a dining room for the benefit of its residents. Residents are charged for each meal served but may contract for either one, two, or three meals on a monthly basis at a better rate. If food is delivered to the rooms of those unable to come to the dining area, a special charge is made. A charge is also made where an individual comes to the dining area but needs help to take the tray from the serving area to a table. These charges are made by Manor and are not for the benefit of the employee furnishing the service. A laundry room, with coin-operated equipment, is available to the residents. Manor's apartments are essentially unfurnished, and the residents are expected to furnish the apartments at their own expense. The residents also pay their own telephone bills.

There is testimony that OEA contributed $248,000 to appellant in order to secure government funds to build Manor. Part of this sum, however, was secured from the sale of lifetime lease options to prospective residents, originally for $1,200 but soon thereafter for $1,500. These options give the party a right to move into Manor after certain notice, but give no interest in nor title to the property. They are no more than options to lease. The resident who comes in on an option is expected to pay the same charges as other residents, and no credit from the option payment would or could be applied to these charges.

Appellant's founders were motivated by a desire to provide improved housing for retired teachers. So far as possible, retired teachers are given preference in filling vacancies in Manor, but appellant will take any person near the retirement age of 65 if a vacancy exists. Of the 111 residents responding to a questionnaire in evidence herein, 44 were not retired teachers. Some of the teachers who are in residence were not members of

OEA but taught in other states or in other localities in Nebraska.

Appellant, except possibly in one instance, does not knowingly take anyone who is not fully able to meet its charges. These charges are explained to applicants before admission. Exhibit 32 would indicate that appellant secures full information on an applicant's income and its source in the application. No one is admitted to Manor unless approved by the admission's committee. The board of trustees of appellant are appointed for 1-year terms by the board of directors of OEA. Appellant's Articles of Incorporation provide that a majority of its board of trustees must be members of the board of directors of OEA.

If any of the retired teachers who are residents of Manor do not have sufficient funds to pay all charges, any deficiency is handled through OEA Foundation which, while it makes donations to appellant in the form of equipment and help for retired teachers on care and drug bills, is no part of appellant's operation. It is a separate corporation, organized by OEA, founded to supplement the charitable and educational activities of OEA. It operates a rummage store in which in the past it employed residents of Manor to qualify them for social security.

The main support of Manor's residents is social security, annuities, other income, or family contributions. Appellant now charges $100 monthly for rent, and $60 a month for three meals daily. The average monthly income of the 109 residents who answered a questionnaire circulated by appellant would indicate a monthly average income of $220.86.

Article VIII, section 2, Constitution of Nebraska, provides in part: "The Legislature by general law may exempt * * * property owned and used exclusively for educational, religious, charitable, or cemetery purposes, when such property is not owned or used for financial gain or profit to either the owner or user. * * * No

property shall be exempt from taxation except as provided in the Constitution."

Pursuant to this grant of power, the Legislature has enacted section 77-202, R. S. Supp., 1969, which, so far as pertinent herein, provides: "(1) The following property shall be exempt from taxes: * * * (c) Property owned and used exclusively for educational, religious, charitable, or cemetery purposes, when such property is not owned or used for financial gain or profit to either the owner or user."

The question presented is whether Manor is used exclusively for educational or charitable purposes within the ambit of the constitutional grant. We hold that it is not. Statutes exempting property from taxation should be strictly construed and one contending that his property is exempt must clearly show that he is within the exemption provided by statute. Berean Fundamental Church Council, Inc. v. Board of Equalization, 186 Neb. 431, 183 N. W. 2d 750.

In Nebraska Conf. Assn. Seventh Day Adventists v. Board of Equalization, 179 Neb. 326, 138 N. W. 2d 455, we held: "The burden of proof is upon one claiming property to be exempt from taxation to establish that its predominate use is for one of the purposes set out in section 77-202, R. R. S. 1943."

Can Manor be classed as a charitable institution? It might be considered a charity in the sense that any benefit afforded another may be a charitable act, but that is not the test. Some jurisdictions grant tax exemption when the property has some charitable characteristics. Our law, however, requires a finding that the property is used exclusively for charitable purposes. The word "exclusively" as used in the Constitution is one of general understanding. Its meaning is so clear that it requires no interpretation but only application. The test then under our law is whether Manor's dominant purpose may be classified as exclusively charitable within the meaning of those terms to qualify for tax

exemption. The fact that some of its residents have been unable to pay all the charges assessed does not make Manor a charitable institution. Every profit-oriented nursing home will have some uncollectible accounts.

Appellant makes a very strong case for the plight of the aged. We concede that moral and charitable considerations dictate the need for a much greater effort to meet the increasing social, medical, mental, and physical problems of the aged. We also concede, as we said in the previous case, it is not difficult to perceive the very worthy charitable aspects of appellant's operation. However, we cannot agree with appellant that Manor is owned and used exclusively for charitable purposes and not for financial gain or profit to appellant. We further concede appellant's attempt to operate its facility as close to cost as possible, but cannot ignore the fact that this cost includes the amortization of a very substantial mortgage which will eventually mean the facility will be entirely owned by appellant.

There is some merit to appellant's contention that it is difficult to distinguish this case from some of the previous cases where exemption has been allowed. It is entirely possible some of the distinctions made in the past may be more ethereal than real. This sometimes results from a case-by-case application where ill-defined rules are constantly expanded in difficult cases. Possibly we may have gone too far in some of those cases. Because conditions do change, if they were before us today the result might be otherwise.

In none of the cases on which appellant relies are the facts significantly similar to appellant's, and no attempt will be made to distinguish them. However, as appellant relies extensively on Evangelical Lutheran Good Samaritan Soc. v. County of Gage, 181 Neb. 831, 151 N. W. 2d 446, we do point out some distinctions. The dominant use of the property in that case was to provide nursing home care to any adult 21 or over in need

of help; practically all of its residents require assistance for their mental and physical well-being, with a few of them being mentally subnormal; some require 24-hour supervision; and some are bedfast and incapable of feeding themselves.

In line with the nursing home feature of the "Good Samaritan" case, appellant urges that one of the important distinctions between the present case and the previous one is that Manor is now maintaining a health care center. While Center is an important service for residents of Manor, it is merely incidental to appellant's dominant purpose because that dominant purpose is not to provide nursing home service or medical service akin to a hospital, but to provide housing facilities for the aged. The status of an applicant's physical or mental health is one of the considerations for admission to Manor. No applicant has ever been accepted who was physically or mentally ill.

Appellant's Articles of Incorporation provide that the corporation is formed: "(a) to provide and erect, own, lease, furnish and manage an apartment building, the land and appurtenances thereto, for the use in whole or in part of the Omaha Education Association, a Nebraska corporation, for housing facilities and services for elderly persons on a non profit and/or charitable basis, especially designed to meet the physical, social and psychological needs of the aged, and contribute to their health, security, happiness and usefulness in longer living; * * *."

The addition of Center and the expansion of the health facilities did nothing to change either the dominant use or purpose of Manor, and with the exception of Center, we are dealing with the same essential facts we had before us in 1961 when we held that Manor was taxable. It is neither the incidental use of the property nor the character of the owner which controls. Rather, it is the primary and the dominant use of the property which is controlling in determining whether the property is exempt from taxation. That primary

and dominant purpose herein was to furnish housing to a selected group at cost in an environment that would be conducive to a healthful and happy old age.

Appellant's case is not too different from the recent case of Christian Retirement Homes, Inc. v. Board of Equalization, 186 Neb. 11, 180 N. W. 2d 136, which involved a nonprofit corporation organized by members of the Lincoln Evangelical Ministerial Fellowship who were concerned with the welfare of older members of the community, and developed Eastmont Manor as a project for ministering to the needs of senior citizens. The operation of Eastmont Manor was to be at cost with the residents providing the funds necessary for its operation and to retire its debt. Eastmont Manor contains 64 apartments, a dining room, kitchen, lounge, chapel, recreation area, medicenter, and other facilities. The medicenter is located on the top floor of the building and is equipped to furnish extended hospital care. The district court found that the medicenter and chapel were exempt from taxation but that the balance of the property was not tax exempt. There was no cross-appeal so the only question presented was that of the taxation of the property other than the medicenter and the chapel. We held the dominant purpose of the corporation was to provide housing for elderly persons, and although the operation of Eastmont Manor included many worthy charitable aspects, the ownership and use of the property was not exclusively charitable.

Appellant directs our attention to certain holdings in Evangelical Lutheran Good Samaritan Soc. v. County of Gage, *supra*, and urges their applicability herein. We have heretofore pointed out some of the distinctions between that case and the instant one. The purpose to be accomplished in the establishment of Manor was to provide a place for elderly citizens to obtain suitable homes in attractive and congenial surroundings. It was contemplated that only those with the financial means to pay the rents and charges essential to the operation

of Manor would be accepted. At Manor's inception, options to lease were sold to raise funds to enable Manor to meet governmental requirements to secure a construction loan. While Manor was promoted to provide a suitable residence for retired teachers, others were and are accepted if apartments are available. Ability of the resident to pay has always been of primary concern, and membership in OEA has not been a controlling or absolute factor. The nursing care provided by Manor is a part of the service offered the prospective resident as an inducement to contract with Manor, and is in no sense of the word charity.

There is nothing in this record to indicate that OEA expected to invest its own funds in Manor as an act of charity. When the loans are finally paid off, they will have been paid by the proceeds of options to lease which have been sold and the charges which have been paid through the years by residents. The residents, in paying for the services rendered them in accordance with their contracts, do not consider themselves as the beneficiaries of charity. The development of Manor was a private venture primarily for the convenience of a class having the ability to pay.

From a consideration of all the facts we cannot say that Manor was or is engaged in an operation that was exclusively charitable. We submit that its operations were the same as many privately operated homes for the elderly for profit. We therefore hold that appellant's dominant purpose is to provide housing facilities for members of the teaching profession, and its medical care center is merely incidental to that purpose and does not by virtue of that fact change its dominant purpose or qualify it for tax exemption.

Because an institution is organized as a nonprofit corporation, it is not, merely by virtue of that description, entitled to tax exemption. Even though an enterprise may be operated at a very moderate cost or even at cost, and for the good of humanity, it is not solely by

virtue of those facts a charitable institution within the meaning of our law. With the advent of social security, welfare, medicare, and medicaid programs, assistance is now much more readily available to the elderly than formerly, and possibly some of our earlier thinking on the charitable aspects of certain institutions may not now be realistic. We now see no reason why an institution, merely because it caters to the needs of the aged and infirm, should be exempt from taxation if someone other than that institution is furnishing the cost of the care and maintenance provided by the institution.

Appellant had the burden of proving its right to exemption. It has not met that burden. Judgment affirmed.

AFFIRMED.

BOSLAUGH, J., concurring in result.

I concur in the result reached in this case. I do not concur in many of the statements contained in the opinion of the court.

I do not agree with the vague suggestion that a number of our past decisions should be overruled, particularly those relating to institutions furnishing care for the sick and the infirm.

Nonprofit institutions for the care of the sick and the infirm have long been recognized as charitable institutions. St. Elizabeth Hospital v. Lancaster County, 109 Neb. 104, 189 N. W. 981; Mary Lanning Memorial Hospital Assn. v. Adams County, 117 Neb. 618, 221 N. W. 959; Allebach v. City of Friend, 118 Neb. 781, 226 N. W. 440; 14 C. J. S., Charities, § 16, p. 447. As stated in 15 Am. Jur. 2d, Charities, § 79, p. 85: "It is universally held that a gift of property for the establishment of a hospital is a valid charitable gift and, as to such a gift, the rule against perpetuities does not apply. The establishment of hospitals is in fact one of the objects enumerated in the Statute of Charitable Uses."

Charitable does not mean that the services of the institution are furnished free of charge. It is well established that a hospital operated not for profit is not deprived of its eleemosynary character by the fact that patients who are able to pay are required to do so. As stated in St. Elizabeth Hospital v. Lancaster County, *supra:* "No individual, society or corporation receives any pecuniary profit from hospital property, funds or earnings. Surplus and donations are used to enlarge buildings and to improve hospital facilities, equipment and service. The institution is open alike to charity patients and others without regard to race or religious beliefs. Reasonable compensation is required from those who are able to pay it. Only a small percentage of those who seek rooms, food and hospital care, however, can be considered charity patients, but this does not change the charitable purpose for which the property as a whole is used, where no one receives any pecuniary profit from any source. Part of the burdens of government in caring for the poor is borne by the hospital. Charitable gifts and gratuitous services are contributed to the welfare of society. There are therefore reasons for immunity from taxation. The better rule, one sanctioned by precedent, is that the property in controversy is used exclusively for religious and charitable purposes within the meaning of the constitutional and statutory provisions relating to exemptions."

These rules which have become an inherent part of the law affecting such institutions and their property should not be abandoned by this court at this time.

McCOWN, J., dissenting.

I agree with the concurring opinion of Boslaugh, J., except that I believe exemption should have been allowed here for the infirmary.

The one physical change in the property and its use after our original decision involved the complete remodeling of the second floor and its subsequent exclusive use as an infirmary. There should be little question

under our previous cases that a specific identified portion of a building, which differs in use from the remainder of the building, may be either taxed or excluded separately. See Christian Retirement Homes, Inc. v. Board of Equalization, *ante* p. 11, 180 N. W. 2d 136. Constitutional exemptions for property as applied to portions of a single building ought not to depend upon whether there is a separate and distinct title to the portion of the building sought to be taxed or exempted. In the day of condominiums, such distinctions are a matter of form and not of substance.

NEWTON, J., concurring.

I agree with the opinion of Spencer, J., but wish to make clear the essential characteristic of OEA Manor. This is not a philanthropic or charitable promotion. It is, in essence, an attempt by a group of private citizens, namely teachers, to provide a retirement home *for themselves* in their later years. True they do admit others, but only when the Manor is not fully occupied by the teachers who promoted it, and then for the obvious purpose of securing the maximum income. In what respect does it differ from a cooperative apartment project? If the active teachers in Omaha were to enter into such a venture to provide housing for themselves, could it be seriously contended that because it was a nonprofit venture it was therefore charitable in nature? I think not.