Wilson V. GLASS, Assessor of Tulsa County, Oklahoma, Appellee,

v.

OKLAHOMA METHODIST HOME FOR THE AGED, INC., Appellant.

No. 43802.

Supreme Court of Oklahoma.

Oct. 24, 1972.

S. M. Fallis, Jr., Dist. Atty., G. W. Bill Newton, Chief Civil Assistant, Dist. Atty., Tulsa, for appellee.

Gable, Gotwals, Hays, Rubin & Fox, Tulsa, for appellant.

WILLIAMS, Justice.

This is an appeal by the Oklahoma Methodist Home for the Aged, Inc., from a judgment of the district court holding, in effect, that all of the property of that corporation located on a 40 acre tract in Tulsa County, except a chapel used exclusively for religious purposes, was subject to ad valorem taxation during the 1966 tax year.

Appellant was organized as a non-profit corporation in 1954 by the Oklahoma Conference of The Methodist Church. It operates a facility called Methodist Manor for the care of the aged, including nursing and health care for those who need it. Until 1966, its property had been considered by authorities in Tulsa County to be "property used exclusively for religious and charitable purposes * * *" under Article 10, Section 6, Oklahoma Constitution, and therefore tax exempt.

In March, 1966, the Tulsa County Assessor notified the Home in effect that its exempt status had been changed and that its property would be placed upon the ad valorem tax rolls for that year. Taxpayer filed a successful protest to the assessment before the Board of Equalization of Tulsa County and the County Assessor then appealed to the district court, which ruled in his favor (except as to the chapel, as to which there is no dispute). The Home then appealed to this Court.

Basically, the dispute as to the tax status of the 40 acre tract arises because of the financing practices of the Home. It admittedly charges and collects "monthly fees" from those who are able to pay, to the extent of their ability to pay. Aside from the varying opinions of two expert witnesses, to be mentioned hereinafter, the evidence is substantially without conflict.

The monthly fees are set on an estimated "at cost" basis. Although many residents of Methodist Manor pay the full amount of the fees, a substantial number are unable to do so and pay only what they can afford. Some then paid only the $78.-00 per month portion of their Welfare Department check allocable to rent and food. Although in 1966 there was no resident in the Home who was paying nothing at all, the uncontradicted evidence was that the Home had had such residents in the past, and that no applicant for admission had ever been turned away because of inability to pay.

In the interests of brevity, we will discuss the issues generally and not attempt to consider separately the propositions argued in the respective briefs, which are not in all cases directly responsive to each other.

This matter was tried, appealed and briefed before the Court's recent decisions in a series of cases involving similar questions. See Immanuel Baptist Church v. Glass, Okl., 497 P.2d 757; Eastwood Baptist Church v. Glass, Okl., 497 P.2d 761; Holland Hall School v. Glass, Okl., 497 P. 2d 763.

■ The Home argues that 68 O.S.1965 Supp., § 2405(h), mentioned in the trial court's conclusions of law, is unconstitutional because it seeks to substitute the use of the net income from the property for the use of the property itself as the test in determining whether the property of a charitable organization is tax exempt. However, we agree with the assessor that this question is not presented in the case now before us, since it clearly was not tried on that theory. Also, in view of the trial court's finding that the operation of the Methodist Manor is subsidized by the Oklahoma Conference of The Methodist Church, it may be doubted that the Home has any "net income" as that phrase is ordinarily used. Our further discussion of the case will therefore be without regard to § 2405(h).

There is some argument in the briefs as to whether the Home is actually operated at a loss. An expert accountant, testifying for the Home, presented two income state-

ments for the year ending April 30, 1966. One, called an operations statement, may be described generally as a statement of income from the residents of the Home and disbursements actually made in the day-to-day operation of the Home. This statement showed that disbursements exceeded income by about $50,000. The other, called a non-operations statement, may be described generally as a statement of other receipts consisting mostly of gifts (about $220,000 from Methodist churches and individuals) and a construction loan of $140,000 and disbursements for purposes of capital improvements, construction, fund-raising, etc. This statement showed an excess of income over disbursements of about $149,000.

An expert accountant testifying for the assessor was of the view that the two income statements should be combined into one pure "cash in, cash out" statement, without regard to the source of the receipts or the purpose of the disbursements, in which case the Home would have shown a substantial "profit".

■ We are unable to agree that the two statements should be combined. Gifts from outside sources are patently not "income", as that term is ordinarily used in determining whether a particular venture, commercial or charitable, earns a profit or sustains a loss.

■ Included as gifts in the non-operations statement is an item of income denominated "Founders' Gifts" in the amount of about $92,000. Under uncontradicted evidence, these "gifts" are amounts paid in advance by applicants for admission to the Home. They are not required as a condition for admission, and those who voluntarily make these lump sum payments pay reduced monthly fees for their care while they live in the Home, the amount of the reduction depending upon the amount of the lump sum payment ($7.50 per month less monthly payments per $1,000 of Founder's Gift, or advance payment). The advance payments are in effect prorated over a ten year period, and if the payer leaves the Home in less than ten years, the balance left over is rebated to him on that basis; if he dies in less than ten years, the balance goes to the Home; and if he lives in the Home longer than ten years, he pays only the reduced monthly fees for the entire time. Under the evidence, the advance payment is "used up" by the reduction in the monthly fees in about ten years.

The assessor's expert witness was of the view that the entire $92,000 from "Founders' Gifts" should be considered as income for the year 1966. However, in view of the uncontradicted evidence as to how these funds are acquired and used and the possible necessity of paying rebates, it is clear that only one tenth is available in any given year for the payment of ordinary expenses. In fact, the testimony was that they were considered as pre-paid rent and as "trust funds", rebatable pro rata as indicated, but usable by the Home, after earned, for construction of more living quarters for "members of the Home family".

When one tenth (about $9200) is added to "income" on the operations statement, that statement still shows a loss of about $41,000 for 1966. It is not argued that the "Founders' Gift" arrangements, considered collectively and aside from other financing arrangements, result in a profit to the Home. This is unlikely, in view of expert opinion testimony to the effect that aged persons who live in facilities such as Methodist Manor live from five to twenty years longer because of the happy environment and excellent care they receive there.

■ A third financing practice of the Home is generally similar to the "Founders' Gift" arrangement except that it results in a capital improvement. Under this plan, applicants for admission to the Home who are financially able and wish to do so are permitted to build small cottages on the premises under plans approved by the Home. Although the cottages are the property of the Home, the builders are permitted to occupy them on a "rent free" basis as long as they live, paying only for

their food and whatever nursing and health care, and other special services, they may require. If the builders leave the Home, the cottages may be "sold" to other applicants on the same basis, and when the builder dies the cottages may be used for housing residents who pay, to the extent of their ability, the regular monthly fees.

Although it must be conceded that the cottage financing arrangement has some of the aspects of both income and gifts, we think it is more properly considered as a gift arrangement, since the ultimate result is an addition to the facilities of Methodist Manor at little or no cost to it.

All of the trial court's findings of fact, made a part of the journal entry of judgment by reference, save one, would have supported a holding that the 40 acre tract is tax exempt. The tenth paragraph of the findings was simply that "The facilities of 'Methodist Manor' are not available to any person regardless of his ability to pay". In his corollary conclusion of law, the court cited Tulsa County et al. v. St. John's Hospital, 200 Okl. 176, 181, 191 P.2d 983; and In re Farmers' Union Hospital Association of Elk City, 190 Okl. 661, 126 P.2d 244.

■ In the first case cited, the property of the Sisters of the Sorrowful. Mother, a corporation (St. John's Hospital, a chapel, a school for nurses) was held to be exempt from ad valorem taxation under Art. 10, Sec. 6, Oklahoma Constitution, and in the opinion this Court specifically held that " * * * the fact that it charges and receives pay for patients able to pay does not detract from the charitable nature of the service rendered". We think the income received by Methodist Manor from its residents (to the extent of their ability to pay) is directly analogous to the income of St. John's Hospital received from patients able to pay. Such income is therefore no bar to the claim of tax exemption.

In the Farmers' Union Hospital Association case, the evidence showed that members did not own capital stock but "memberships" which cost $50. For their hospi-tal services these members paid an annual fee which was set by " * * * estimating the cost for the current year on past experience and future expectations". The secretary-treasurer of the Association testified that costs to members were "on a cooperative basis". Non-members paid the customary cost for hospital services, at a much higher rate. The hospital generally made an annual profit which was used to reduce the cost of service to the *members* for the following year. This Court concluded that "this organization intended charity and benevolence, and private benefit and advantage to its membership, and no one else", noting that officers of the association "very carefully refrained from saying that its doors were open to the world irrespective of ability to pay." Of course, the uncontradicted evidence in the case now before us is very different.

In the briefs, counsel have diligently cited cases from many other states of this country. While no case cited is precisely in point on all facts, the citations have been helpful on the general question of what is a charitable use within the meaning of constitutional or statutory provisions exempting property so used from taxation. See, for instance, Oregon Methodist Homes, Inc., v. Horn, 226 Or. 298, 360 P.2d 293, in which the claim of tax exemption was denied, and Topeka Presbyterian Manor, Inc., v. Board of County Commissioners, 195 Kan. 90, 402 P.2d 802, in which it was granted.

In *Oregon Methodist Homes*, a "founder's fee" of up to $20,000 was *required* of *all* prospective residents. The Oregon Supreme Court found that these fees had been "entirely adequate to pay for the land, construct the buildings, purchase the furnishings and to build a sewage disposal plant, sprinkler system, hospital equipment and the like, all of which when finished represented a total investment of $2,891,000", all without gifts or donations of any kind. When the original "founders" died or moved away, the facilities were available for use only by others who

could pay the founder's fee or its equivalent. The Court further found that "no discounts to the less opulent and no free or charity service to the indigent" was given, and that the facility was operated at a *profit* of from $3500 to $4000 *per month* above operating costs. The Court accordingly denied the claim of tax exemption, which had been based upon a statute exempting property used for "literary, benevolent, charitable or scientific work." The material differences between the facts in that case and the facts in this one are obvious.

In its lengthy and detailed opinion in that case, the Oregon Supreme Court included a discussion, beginning at page 298 of the Pacific Reporter, of seven factors or tests that are ordinarily used in determining whether a particular use is or is not a charitable one. An explanation and discussion of each of these factors would unduly lengthen this opinion. However, we find in the record before us substantially uncontradicted evidence satisfying the requirements of all of the suggested seven tests.

In *Topeka Presbyterian Manor,* in which the Kansas Supreme Court sustained a claim of tax exemption under constitutional provisions almost identical with ours, the material facts were very similar to those shown in the record before us. The home in that case had been constructed with substantial gifts and a loan; it was operated at an annual loss; pay was accepted from residents able to pay, to the extent of their ability to pay; and in Kansas, as in Oklahoma, constitutional provisions exempting property from taxation are strictly construed.

In view of his citation of the Farmers' Union Hospital Association case, in which the tax exemption was denied because the benefits were restricted to *members,* the trial judge possibly was concerned about a by-law of Methodist Manor which provided that preference for admission should be given to members of the Methodist Church within the bounds of the Oklahoma Con-

ference. The same rule provided that members of other denominations "may be admitted" and that "No applicant shall be denied admission solely because of membership in a non-Methodist church, or because of inability to pay." Although this rule officially was amended "as soon as this tax assessment was made," it had been in effect in practice continuously from a time preceding January 1, 1966, and therefore must be considered in connection with the 1966 tax status of the 40 acre tract.

A similar preference with a similar proviso was involved in *Topeka Presbyterian Manor,* in which it was stipulated that such preferences had actually been made. The Kansas Court, noting that about one fourth of the residents of the Manor were not Presbyterians, cited earlier Kansas holdings that such a classification was not fatal to a claim of tax exempt status for property used for charitable purposes, and affirmed the trial court's order granting the exemption.

No similar prior holdings of this court on this point are cited, and we know of none. However, there is uncontradicted evidence in the record before us to the effect that the rule providing for the preference has never been followed, and that about one third of the residents of Methodist Manor are non-Methodists. The prevalence of Methodists among the residents of Methodist Manor may be accounted for by the fact that, under the evidence, the necessary annual subsidy furnished by the Oklahoma Conference of The Methodist Church is collected in annual Mother's Day or special day offerings in Methodist churches. This evidence justifies the conclusion that the availability of the services and facilities of Methodist Manor is much more generally known among Methodists than non-Methodists. In In re Farmers' Union Hospital Association of Elk City, 190 Okl. 661, 126 P.2d 244, this Court in effect held, among other things, that evidence as to the actual "manner of conducting the hospital" is probative in determining its tax status, despite provisions in a

corporate charter seemingly to the contrary. Similarly, we think the uncontradicted evidence that no preference involving race, creed or ability to pay had ever been given in this case is controlling over the existence, on Jan. 1, 1966, of a by-law which would have permitted such a preference.

We determine that the overall purposes and practices of Methodist Manor were charitable in nature and all its property was properly held by the Tulsa County Board of Equalization to have been tax exempt. Therefore, the trial court's judgment is reversed and the cause is remanded with directions to enter judgment holding that the entire 40 acre tract is exempt from ad valorem taxation.

All of the Justices concur.