**WESTMINSTER GERONTOLOGY FOUNDATION, INC., Appellant,**

**v.**

**STATE TAX COMMISSION, Respondent.**

**JOHN CALVIN MANOR, INC., Appellant,**

**v.**

**STATE TAX COMMISSION, Respondent.**

· **Nos. 58413, 58414.**

Supreme Court of Missouri,
Division No. 1.

April 14, 1975.

Motion for Rehearing or to Transfer to Court
En Banc Denied May 12, 1975.

Charles L. Bacon, Shook, Hardy & Bacon, Kansas City, Eugene T. Hackler and Robert C. Londerholm, Hackler, Londerholm, Speer, Vader & Austin, Olathe, Kan., for appellants.

Stanley Christopher, Jackson County Counselor, Leland Shurin, Special County Counselor, Kansas City, for respondent.

WELBORN, Commissioner.

Consolidated appeals in proceedings for review of denial by State Tax Commission of exemption from taxation of property devoted to housing and care of older persons. Circuit court affirmed decision of Commission. Taxpayers appeal.

Westminster Gerontology Foundation, Inc., was organized under the Missouri Not For Profit Corporation Law in 1964. It was formed by the Northwest Missouri Presbytery of the Presbyterian Church as an agency to assist in meeting the needs of the aging. The members of the Presbytery are the members of Westminster.

The first project undertaken by Westminster was the construction and operation of John Calvin Manor, located in Lee's Summit, Missouri. A separate not-for-profit corporation, John Calvin Manor, Inc., was formed to take title to the property, on which residential units were constructed under § 202 of the Federal Housing Act, which makes available a 3% 50-year loan to an acceptable sponsor to provide low-cost housing for low-income elderly. The Presbyterian Church contributed $25,000 to help start the project. $40,000 was paid for the land and $975,681

for construction of the building which provides 100 residential units. The building was built in 1969. Residents must be at least 62 years old. Income limits for residents in John Calvin Manor are: $4,500 for a single elderly person; $5,400 combined income for two elderly persons; and $6,600 for two unrelated elderly persons sharing an apartment.

Taxes on this property based upon the assessment by Jackson County for the year 1970 were the subject of a recent decision by this court in the case of John Calvin Manor, Inc. v. Aylward et al., 517 S.W.2d 59, decided December 16, 1974. That case involved the reduction of a $225,500 assessed valuation to $500 because of lack of proper notice of the increase. In 1971, the property was again assessed at $225,500. The taxpayers made a claim of exemption before the Jackson County Board of Equalization, which denied the claim. On appeal to the State Tax Commission, that body, after a hearing, affirmed the denial of relief. The Jackson County Circuit Court affirmed the ruling of the Commission. That judgment is the subject of the appeal by John Calvin Manor, Inc. in Cause No. 58,414.

A second project of the Westminster Foundation involves the Vista Del Rio apartment building, located in Kansas City. That building is a 20-story building containing 239 residence units of varying sizes. It was built in 1966 by the Kansas City Education Association to provide housing for retired teachers. It was financed by a $4,310,000 loan under § 231 of the Federal Housing Act. The Kansas City Education Association operation was not successful and in 1968 an agreement was entered into by which Westminster took over the project. Westminster caused a Missouri not-for-profit corporation, Vista Del Rio, Inc., to be formed for operation of the project. The minimum age for residents at Vista Del Rio is 65 years. Residents of Vista Del Rio pay an entrance fee, ranging between $8,480 to $19,393, depending upon the size and loca-

tion of the apartment provided, plus a monthly service charge ranging between $134 and $234 per month. The residents occupy their apartments under a life care contract, which provides for a lifetime occupancy in the home, various stipulated services, medical-related assistance and participation in various activities and programs of the house.

In 1970, the property was assessed for tax purposes at $500. In 1971, the assessment increased to $800,000. Westminster sought exemption of the property. The Jackson County Board of Equalization denied the exemption. The State Tax Commission affirmed such denial. The Jackson County Circuit Court affirmed the order of the Commission. Appeal from that judgment is the subject of Cause No. 58,413.

In both instances, the taxpayer claimed relief on the grounds that the property was used for religious and purely charitable purposes within the meaning of § 6, Art. X, Const. of Mo., V.A.M.S., and § 137.100, RSMo 1969, V.A.M.S. The tax commission denied the claims on both grounds. The appeals here are premised on the claim that the property is "used exclusively * * * for purposes purely charitable," within the meaning of the constitutional and statutory provisions.

The question of exemption from taxation of property of nonprofit corporations providing residential facilities and accompanying services for older persons has been before the courts frequently in recent years. This court considered the question in the cases of Defenders' Townhouse, Inc. v. Kansas City, 441 S.W.2d 365 (Mo.1969), and Paraclete Manor of Kansas City v. State Tax Commission, 447 S.W.2d 311 (Mo.1969). The tax commission relied largely upon Defenders' Townhouse in denying the claimed exemptions in these cases.

Turning first to Vista Del Rio, appellant would distinguish that operation from those involved in Defenders' Townhouse and Paraclete Manor on the grounds that the facilities there involved "were essentially mere housing for the elderly, with little else provided in the overall program for health care and health maintenance." Vista Del Rio, appellant asserts, involves "a modern home for the aged operating under a life care concept" with "a heavy religious emphasis maintained throughout the operation."

Among the findings of the tax commission was: "Vista is committed to care for its people the remainder of their lives." Appellant points out the emphasis on medical care and health maintenance which the Vista program provides. An eight-bed infirmary is located in the building. Specialized medical care in the infirmary is provided for in the occupancy agreement for up to 10 days each year at no extra charge. In actual operation, no charge has been made persons requiring more than 10 days infirmary care in a year.

Vista Del Rio has two registered nurses, five licensed practical nurses and five nurses' aides, working various shifts. A registered nurse resides at the facility and is on call at all times. The nursing staff serves all residents of the facility. They assist patients in the infirmary and also in the apartments when they are ill or physically handicapped. Medication is distributed to infirmary patients and to residents of apartments who are unable to follow directions for medication. Practical nurses check residents in their apartments who are ill with minor problems. The registered nurses observe and evaluate the health care of the residents; make daily reports to the administrator and weekly reports to a staff physician who makes regular weekly visits during which he normally sees between 15 and 25 residents per visit. The physician also examines patients in the infirmary.

The facility provides two meals per day for the residents. One is a basic meal, designed to provide essential nutritional needs, which all residents who are physically able are required to take in the dining

room. The cost of the meals is included in the regular monthly charge. Residents requiring special diets are provided such diets.

Operation of Vista Del Rio includes various social activities for residents, including movies, card parties, fellowship gatherings and social gatherings. Shopping tours are provided, as well as tours to points of interest within and beyond the city.

The Executive Director of Westminster is a minister with 27 years' experience as a parish minister. He serves as Chaplain for the residents. Regular religious services are conducted in the home by area ministers and transportation is provided to area churches of the resident's choice. Admission to the home is not related to religious preference. In 1971, the residents represented 13 different religious denominations.

Vista Del Rio is not a nursing home. A physical examination is required for all applicants for residence. Admission is limited to persons in reasonably good health who are able to look after themselves in their own apartments. Residents who become unable to care for themselves by reason of infirmities are cared for in their apartments. When the need for nursing home care arises, persons are transferred to nursing homes not operated by Vista. Vista has borne the cost of such cases, although its occupancy agreement does not require it to do so.

Occupants assign their Medicare and private hospitalization insurance to Vista. Vista does provide outside hospital care at no extra charge.

There would appear to be little room for argument that a facility such as Vista does fulfill an important social need. A combination of circumstances has caused attention to be focused on the needs of the elderly. There can be no doubt that providing them with comfortable housing in pleasant surroundings and providing them

with counseling, a program of social activities and health facilities and care is beneficial not only to the persons for whom such services are provided, but also to society in general.

However, for purposes of exemption from taxation, attention must be directed not only to the objects of an organization seeking exemption, but also to the means by which such objects are to be accomplished, particularly from an economic point of view.

Some reference has previously been made to the mode of financing Vista's operations—the entrance fees and monthly service charges. There is no dispute that the Vista operation is a not-for-profit enterprise. It appears that the entrance fees are retained by Westminster and the monthly service income goes to Vista Del Rio, Inc. Tax returns of Westminster show receipt of $1,420,866.40 from such sources in 1969 and $583,432.18 in 1970. Interest income for the two years amounted to approximately $22,000. For the year ended February 28, 1971, Vista Del Rio, Inc. showed a gross income of $905,901, including $436,133 rents, $95,976 from dining room, $354,352 from grants and endowments and $3,552 "gifts and miscellaneous." The grants and endowments came from Westminster from the entrance fees it had received. Vista Del Rio, Inc. showed a net operating loss of $135,027 for the February, 1971 fiscal year. The operation of Vista Del Rio is designed to liquidate the indebtedness on the building from the entrance fees and service charges.

The Executive Director and Controller are the only salaried employees of Westminster. They render services both for Vista Del Rio and John Calvin Manor.

Vista Del Rio has no regular program for the admission of persons unable to pay the entrance fees or the monthly charges. Each situation is met on an "individual basis." If a person without means to pay both the entrance fee and monthly charges should apply for admission, and if the

home could "provide the means of taking care of that person," it would do so, judging the application upon its individual merits. At the time of the hearing before the Commission there had been, in some 21 instances, a reduction of the endowment fee or monthly service charge, resulting in a $39,157 reduction in entrance fees and a projected $2,306.40 annual reduction in the monthly service charges. All persons in Vista Del Rio were paying something toward their care.

The financial aspects of the operation of Vista Del Rio are what the tax commission relied upon in denying exemption from taxation. The commission in effect concluded that a self-liquidating operation, such as Vista Del Rio is designed to be, in which the beneficiaries of the operation pay both the capital outlay and operating expenses, cannot qualify as a "purely charitable" operation under the Missouri constitutional and statutory provisions, as applied in the Defenders' Townhouse and Paraclete Manor cases.

■ Neither Defenders' Townhouse nor Paraclete Manor stands for the proposition that a not-for-profit operation to provide housing for the elderly loses its charitable nature because residents are charged for the facilities they receive. Missouri has long since abandoned the idea that charity can exist only for the indigent. Salvation Army v. Hoehn, 354 Mo. 107, 188 S.W.2d 826, 829–830[4, 5] (1945); Y. M. C. A. v. Sestric, 362 Mo. 551, 242 S.W.2d 497 (banc 1951). However, the cases relied upon by the tax commission do point up the problems that exist when the beneficiaries of the charity are the sole providers of the financial means for the claimed charitable operation. This feature of the Vista Del Rio operation, which it had in common with the Defenders' Townhouse and Paraclete Manor, is in contrast with the situation which has been presented in other jurisdictions in cases which appellant points to as having sustained charitable exemptions for homes for the aged. Thus, in Bozeman Deaconess Foundation v. Ford,

151 Mont. 143, 439 P.2d 915 (1968), payments from residents would not pay the mortgage on the facility. "Charitable donations will be required to make up the difference." 439 P.2d 916. In Fredericka Home for the Aged v. San Diego County, 35 Cal.2d 789, 221 P.2d 68 (1950), the land and buildings, along with a $200,000 trust fund, had been donated. Income from residents provided 65% of the cost of operation, the remainder coming from the endowment fund. In State Board of Tax Commissioners v. Methodist Home for the Aged, 143 Ind.App. 419, 241 N.E.2d 84 (1968), the home was constructed on a 40-acre tract received as a gift and one half of the cost of construction was furnished by Methodist churches. In South Iowa Methodist Homes, Inc. v. Board of Review, 173 N.W.2d 526 (Iowa 1970), the original building had been purchased with church funds and financing of additions was by way of donations from the Methodist Conference, individual churches and individuals, as well as by some gifts. In Glass v. Oklahoma Methodist Home for the Aged, Inc., 502 P.2d 1268 (Okl.1972), "operation of the Methodist Manor is subsidized by the Oklahoma Conference of The Methodist Church." 502 P.2d 1270. In In re Tax Appeals of United Presbyterian Homes, 428 Pa. 145, 236 A.2d 776 (1968), the Home was established by Huntingdon Presbytery from gifts and contributions made by its members and friends. "A fund-raising campaign raised in excess of $340,000." 236 A.2d 777. This distinction and several of the cases here cited by appellant were noted in Defenders' Townhouse. 441 S.W.2d 372.

It should also be noted here that in three of the jurisdictions from which cases are cited by appellant in support of its proposition that the majority of cases in other jurisdictions support tax exemption in operations such as here involved, statutes expressly authorizing such exemption were present: Milwaukee Protestant Home for the Aged v. City of Milwaukee, 41 Wis.2d 284, 164 N.W.2d 289 (1969); Bozeman

Deaconess Foundation v. Ford, supra; City of Winter Park v. Presbyterian Homes for Synod, 242 So.2d 733 (Fla. App.1970). In the last cited case, the statute was the basis for a decision that an operation involving payment of a founder's fee and monthly rental charge did not prevent exemption of the home as a not-for-profit venture. An earlier decision, prior to the statute, by a Florida Court of Appeals in Haines v. St. Petersburg Methodist Home, Inc., 173 So.2d 176 (1965), had relied heavily upon the fact that the founder's fee and monthly rental charge had "substantially recompensed" the home's expenditures (173 So.2d 185) in providing for its residents. See also Presbyterian Homes of Synod of Florida, Inc. v. City of Bradenton, 190 So.2d 771 (Fla.1966), in which the court held nonexempt an operation involving founder's fees and monthly rentals in which operating and mortgage payment deficits were made up by donations from persons and churches within the synod.

Among the cases which have emphasized the use of payments from the residents to defray the entire cost of the project in denying exemption to retirement residences are Friendsview Manor v. State Tax Commission, 247 Or. 94, 420 P.2d 77 (1966), affirmed on rehearing, 427 P.2d 417 (1967), cited in Defenders' Townhouse; County of Douglas v. OEA Senior Citizens, Inc., 172 Neb. 696, 111 N.W.2d 719 (1961), referred to in Defenders' Townhouse, but not cited by name; Lutheran Home, Inc. v. Board of County Commissioners, 211 Kan. 270, 505 P.2d 1118 (1973); United Presbyterian Ass'n v. Board of County Commissioners, 167 Colo. 485, 448 P.2d 967 (1968); Methodist Old Peoples Home v. Korzen, 39 Ill.2d 149, 233 N.E.2d 537 (1968); Madonna Towers v. Commissioner of Taxation, 283 Minn. 111, 167 N.W.2d 712 (1969); Presbyterian Homes v. Division of Tax Appeals, 55 N.J. 275, 261 A.2d 143 (1970). Admittedly, those cases are more nearly like Defenders' Townhouse and Paraclete Manor, insofar as the nature of the services provided residents is concerned, being primarily concerned with housing. With the exception of the Nebraska and Kansas cases, a recognized religious group was the sponsoring agency in each of the cases.

In connection with appellant's distinction of this case from Defenders' Townhouse and Paraclete Manor on the basis of the overall program for health care and health services here provided, another Nebraska case is of interest. County of Douglas v. OEA Senior Citizens, Inc., supra, involved a project sponsored by the Omaha Education Association, primarily to provide low-cost housing for retired teachers. In denying tax exemption, the court pointed out that the project, although a not-for-profit one, contemplated that each resident should pay his share of the capital and operating expense. The exemption of the same property was before the Nebraska Supreme Court in OEA Senior Citizens, Inc. v. County of Douglas, 186 Neb. 593, 185 N.W. 2d 464 (1971). In the later case, one of the major developments since the earlier case, had been the establishment of a health care center in 12 units of the building. The center was under the direction of a registered nurse. It provided hospital-type nursing care for residents, but seriously ill persons were hospitalized elsewhere. Services were also rendered by center staff in the residential units, including giving of shots, baths and assisting residents to the dining area. There was no physician on the staff and all medical services rendered residents other than "nursing care" were rendered by the patient's own physician. Instead of including the cost of such services in the overall monthly charge, residents were charged for the services actually rendered.

In holding that the addition of the Center did not alter the tax status of the property, the court stated (185 N.W.2d 468–469[5]):

"The addition of Center and the expansion of the health facilities did nothing to change either the dominant use or purpose

of Manor, and with the exception of Center, we are dealing with the same essential facts we had before us in 1961 when we held that Manor was taxable. It is neither the incidental use of the property nor the character of the owner which controls. Rather, it is the primary and the dominant use of the property which is controlling in determining whether the property is exempt from taxation. That primary and dominant purpose herein was to furnish housing to a selected group at cost in an environment that would be conducive to a healthful and happy old age."

■ A similar conclusion is reached in this case. Vista Del Rio is primarily a place of residence for elderly citizens. The objective to provide for them there in pleasant surroundings and to meet their social, psychological and physical needs is indeed laudable. However, the financial means for such provision is furnished by the residents. The evidence clearly shows that Vista Del Rio is primarily for the benefit of the elderly able to pay. At the time of the hearing, some 2% of the total founder's fees had been waived. Rental waivers amounted to less than $\frac{1}{2}$ of 1% of the annual rental income. The medical assistance offered the residents undoubtedly adds to the attractiveness of Vista Del Rio. However, it is in no sense offered to them as charity and they pay for it. None of the residents of Vista Del Rio appeared before the Tax Commission. However, it is difficult to imagine that they consider themselves beneficiaries of a charitable organization.

Concern for the burden of the property tax upon the elderly citizens of this state led the General Assembly to enact a proposed constitutional amendment which was accepted by the voters in 1972 and now appears as Section 6(a) of Article X, Constitution of Missouri. The General Assembly has enacted implementing legislation, designed to provide relief to renters, as well as property owners, over 65 years of age. Sections 135.010–135.030, RSMo 1973 Supp., V.A.M.S. The relief here sought, which would accrue to the benefit of the Vista Del Rio residents, might well provide them a greater relief than is afforded to elderly persons generally under the most recent policy declaration in this area.

Turning to John Calvin Manor, the element of physical care, provided at Vista Del Rio, is lacking. Appellant's emphasis on that project is that it is a low rental housing facility under church sponsorship and it contends that as such the property is used for purposes purely charitable within the constitutional and statutory tax exemption provisions. Appellant relies heavily upon the decision in Bader Realty & Investment Co. v. St. Louis Housing Authority, 358 Mo. 747, 217 S.W.2d 489 (1949). That case involved housing facilities constructed and operated by the St. Louis Housing Authority for the benefit of low-income families who previously resided in substandard accommodations. "The housing projects produce insufficient income to pay the cost of operation but the difference between the cost of operation and income from rents is made up by contributions from the Federal Government." 217 S.W. 2d 491. The court found that the housing projects were designed to relieve slum conditions. Pointing out that the rental income fell "far short of meeting operating expense," the court said: "Nothing could be more public in value or more beneficial to the community as a whole than the clearance and reconstruction of those slum areas wherein men, women and little children are crowded into hovels of such character as to wholly lack the material things and environmental values productive of good citizenship, good morals and well being." 217 S.W.2d 493. The court held the property of the Housing Authority to be exclusively used for purposes purely charitable.

■ John Calvin Manor did not involve a slum clearance project. Appellant emphasizes that the motivation and impetus to undertake the project came from a religious quarter and that religious services are conducted there and that there is a strong religious emphasis in the entire op-

eration. Obviously, however, the property is not used exclusively for religious purposes, although a religious motive may be of some significance in determining whether or not the use is for purposes purely charitable. Y. W. C. A. v. Baumann, 344 Mo. 898, 130 S.W.2d 499 (banc 1939).

In this case, however, the motive which prompted John Calvin Manor cannot alter the fact that it is basically rental housing for elderly people, with income limitations, provided by a not-for-profit corporation. All residents pay rent and there is no evidence that any program exists to take care of residents who become unable to pay. Housing for the elderly, as for the public generally, is becoming a matter of increasing concern. That an organization such as John Calvin Manor, Inc., with the support of Westminster, is willing to provide it on a nonprofit basis is commendable, but that does not mean that the activity thereby becomes charitable, absent some public purpose such as the slum clearance program involved in Bader. John Calvin Manor is the beneficiary of a low interest mortgage and of certain contributed services from Westminster, such as the service of its Director, accounting services, payment of bills, volume purchasing and other administrative services. (The operating statement of John Calvin Manor, Inc. for the 1970 year shows payment of a management fee of $17,295.00. To whom this is paid does not otherwise appear.) Again, these facts do not alter the primary use of the property. It is basically housing provided at cost to the tenants and the tax commission properly found the right of exemption ruled by Defenders' Townhouse and Paraclete Manor.

Judgments affirmed.

HIGGINS, C., concurs.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the court.

All of the judges concur.